Linda D. MISEK–FALKOFF and Adin Falkoff, Plaintiffs,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.

No. 89 CIV 6269(VLB).

United States District Court, S.D. New York.

May 13, 1994.

William E. Weber, Weber & Weber, Hauppauge, NY, for plaintiffs.

M. William Munno, Seward & Kissel, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

The complaint in this case alleges placement of plaintiff employee Linda D. Misek–Falkoff[1] on permanent disability status by International Business Machines Corporation ("IBM"), the defendant employer (the "employer") in violation of Section 504 of the Rehabilitation Act of 1973 (the "Act"), 29 U.S.C. § 794. Primarily involved is an issue of *res judicata.* Absent *res judicata* there are issues of whether plaintiff was "otherwise qualified" to retain her job[2] within the meaning of the Act and if so whether the defendant employer made "reasonable accommodation" in light of plaintiff's handicaps.

---

1. Adin Falkoff, plaintiff on a loss of consortium claim, is also an employee of the defendant employer. References to the plaintiff in this memorandum order pertain to Linda D. Misek–Falkoff. In light of the disposition in this memorandum order, I do not reach Mr. Falkoff's claim, which is dismissed.

2. When on permanent disability an IBM employee is considered inactive and may not return to work.

Plaintiff suffered during her employment from a physical disorder related to the nervous system. Her condition caused her to be unable to work at unpredictable times. Her unavailability for work lasted for varying lengths of time, sometimes for days; she had substantial absences in connection with her physical disorder, and as the result of surgery in 1985 to alleviate the disorder.

Even when plaintiff was present in the workplace there were problems: plaintiff at times exhibited fits of rage, emotional outbursts, crying episodes and similar behavior, making it difficult if not impossible for many co-workers and supervisors to get along with her. The extent to which these episodes were directly related to, the result of, or independent of her physical condition is unclear. These difficulties increased after mid–1985.

Plaintiff claims that the employer knew about her physical condition, but that for some two years the employer harassed her and restricted her career advancement and job opportunities and eventually removed her from her position as a computer analyst and office educator. She notes that during the period of alleged harassment she received positive job evaluations. She claims that the employer's "campaign" to force her out constituted discrimination on the basis of her handicap in violation of federal law.

The employer moves for summary judgment dismissing the complaint under Fed. R.Civ.P. 56 on the grounds that plaintiff's claims are barred by *res judicata*,[3] and that plaintiff cannot establish a handicap discrimination claim as a matter of law.

While the employer's personnel practices were at times far from ideal and may not be fully excusable even in the difficult circumstances involved, none of these lapses suggests violation or intent to violate any of the statutory guarantees at issue in this case.

The employer's motion to dismiss is granted.

## II

The employer is a leader in the development and manufacturing of computer systems. Plaintiff is a former college professor holding a Ph.D. degree with a background in computers and linguistics. Plaintiff, who is now an attorney,[4] began employment as an at-will employee with IBM in the summer of 1977, first as a senior associate programmer and then as a staff systems analyst (office educator).[5]

Through at least the last seven years of her employment plaintiff suffered from sharp head pains and other symptoms associated with atypical trigeminal neuralgia, a disorder of the nervous system,[6] and she had attacks at unpredictable times. Plaintiff was in frequent communication with the employer's medical department, as were her own physicians, and plaintiff often worked "to tolerance" (that is, as much as possible) or for half-days. Plaintiff sometimes worked at home but not on a regular basis.

Beginning in 1984, plaintiff's medical condition worsened. She was frequently absent, sometimes for extended periods, due among other things to hospitalization in connection with medical tests and brain surgery in July of 1985, and to emotional reactions to work-related experiences. She received satisfactory personnel appraisals in June 1982, August 1983, September 1984, and December 1986. None of the written evaluations contained any comments in the section provided for "significant positive or negative influence on the performance of other employees." The employer claims that performance appraisals,

---

3. After this motion was fully submitted but not yet decided, plaintiff Linda Misek–Falkoff expressed a desire to "drop all lawsuits," Dkt. # 86, but in light of subsequent indications to the contrary, it appears appropriate to rule on the employer's motion for summary judgment.

4. Plaintiff attended law school in the evening while working for the employer and earned a J.D. degree after being placed on permanent disability.

5. Plaintiff's description of her job title differs from the employer's description in that plaintiff claims she was *lead* office educator.

6. At deposition plaintiff's surgeon described atypical trigeminal neuralgia as painful and difficult to diagnose.

which are made in writing, are limited to performance while actually at work and that "conditions of work" such as absences and personal conduct would not be reflected on an employee's personnel appraisal or result in an unsatisfactory evaluation "unless excessive." [7]

This may have minimal significance in the context of this particular case. There were oral criticisms by her supervisors of her ability to work with others: plaintiff was keenly aware of, and in fact disputed, these oral criticisms. Even prior to 1985, plaintiff and her managers had difficulty in working together,[8] and she exhibited occasional extreme emotional reactions in the workplace. Thus written memorialization of such matters would merely have been inflammatory.

In mid–1985 plaintiff's job involved designing software systems, which included working with people within her own group both at regular meetings and one-on-one as a normal part of developing each system. Her job also encompassed attending technical conferences on behalf of the employer, meetings with customers, and undergoing training to keep up-to-date in the field.

An incident triggering events leading to this lawsuit occurred on May 29, 1985.[9] When the departmental computer trainer failed to include plaintiff in a training session, an altercation erupted. The computer trainer transmitted an account to his manager and others by electronic mail alleging that plaintiff had attempted to assault him.

Plaintiff vigorously denies the computer trainer's version of this incident: plaintiff claims that at most she brought her hand down "in frustration" on a table next to the place where the computer trainer was sitting, denting some slides in a binder.[10] Both employees appear to have been shaken by the incident, as was a third employee, who observed the encounter and claimed thereafter to be afraid of plaintiff.[11]

Several weeks later, plaintiff was involved in a second incident, this time with her manager, in which plaintiff claims that the manager grabbed from plaintiff's hand a telephone which then brushed plaintiff's face. Believing that she had been assaulted, plaintiff called for help from the building security and medical departments. Immediately after this affair, the manager requested to be relieved from supervising plaintiff and was replaced by a more senior manager.

Later in the summer of 1985, plaintiff had neurological brain surgery and was out of work for three months. Upon her return in mid-October 1985, plaintiff's work location was changed in order to keep a distance between plaintiff and the other employees involved in the above incidents; she was later moved to another facility, and her job assignment was modified.

Plaintiff's managers determined that plaintiff should be handled "from a medical standpoint." [12] This approach was developed as a result of two personnel investigations, the

---

7. The employer's evaluation system was based on a scale of "1" to "4" in the satisfactory category, with "1" meaning "results far exceed the requirements of the job in all key areas." Plaintiff's performance in 1982 was rated "3"; in 1983 and 1984 she was rated "2"; and in December 1986 she was rated as "3."

   The employer's employee manual describes ratings and pay raises as feedback on how an employee is doing. Plaintiff received a pay increase in October 1986.

8. In light of the protective orders in this case, including an order dated March 25, 1992, and concern about unnecessary disclosure of medical and other potentially confidential records, materials of this nature are provided in sealed exhibits. See Sealed Exh 1 (Defendant's Notice of Motion, Exh I [1981–1984]).

9. I make no findings as to who was at fault in this and any other incident set forth in this memorandum order.

10. Plaintiff claims she immediately offered to replace the slides. See Plaintiff's Sur-reply Aff, Exh. 7 (Pl's Aff in Opposition to Defendant's Motion for Summary Judgment in *Misek–Falkoff v. Keller*, Index No. 17918/86, New York Supreme Court, Westchester County (1986, Guranian, J.)).

11. Contemporaneous reports of this incident include a suggestion not specifically controverted by plaintiff—that her reaction may have been due in part to unrelated events in her personal life. See Sealed Exh 2 (Defendant's Notice of Motion, Exh O).

12. See Sealed Exh 2 (Def's Notice of Motion, Exh. O).

second of which was an internal administrative employee appeals process initiated at plaintiff's request to address various of her concerns. After an extensive investigation, an investigative report prepared for the employer concluded that the computer trainer's account with respect to the first 1985 incident was accurate. The report also concluded that with respect to the second incident plaintiff's prior manager had treated her appropriately and that plaintiff had been told of the exact accusations which had been made against her by several employees. The investigative report did, however, criticize both her prior manager and a medical department physician for inconsistent treatment of plaintiff.[13]

Plaintiff disagreed with the process and the findings, and objected to any further meetings with management unless there was positive news on her behalf.

In June, 1986 plaintiff filed a state court defamation suit against the computer trainer.

In December, 1986 plaintiff became upset after a meeting with her supervisors discussing among other topics:

(1) her most recent performance appraisal in which her rating was reduced from "2" to "3," and

(2) the employer's provision of legal representation for the computer trainer, but not for her, in her lawsuit against him.[14]

Plaintiff claims that the employer's handling of these matters constituted "continuing harassment" that led to "a severe recurrence of her atypical trigeminal neuralgia, requiring hospital treatment." Complaint ¶ 13.[15]

In this instance and in other situations, drastically divergent perceptions of what occurred or was happening made it virtually impossible for plaintiff and her supervisors to coordinate their efforts. This is illustrated by plaintiff's version of her reason for picketing some time in March 1987 near the employer's grounds by holding up a sign carrying a one-word message, "Why." As relayed through her physician to the employer in a document submitted to the court, this was a "subdued move" to indicate the "extreme stress connected with the suit" against the computer trainer and to "demonstrate her plight" because of the employer's provision of legal representation for the trainer.[16]

Mandatory disability had been first considered with respect to plaintiff in early 1986. Plaintiff's managers had by-passed the administrative approach leading to possible termination without benefits [17] and applied instead, in accordance with company policy, for her placement on the employer's Mandatory Disability Insurance Plan ("mandatory disability" or "MDIP").[18]

A handwritten record of a February, 1986 medical disability panel review meeting contains the following note by an attorney: "Had no problem with case. 'Someone not unsat [unsatisfactory] today—can you force her out of business.' Yes. MDIP." [19] The reviewing authorities, however, rejected any

---

**13.** See Sealed Exh 3 (Def's Notice of Motion, Exh P).

**14.** No statute or other legal requirement has been cited relating to an employer's contributions to legal defense of employees sued by other employees because of events in the workplace.

**15.** Plaintiff was absent from the workplace during most of January and February 1987. She claims that her absences were attributable to her employer's "locking her out" so that she could not return despite being "ready, willing and able." Plaintiff does not, however, specifically controvert evidence to the contrary as to portions of that time period. See Sealed Exh 4 (Def's Reply, Exh E).

**16.** See Sealed Exh 5 (Plaintiff's Affidavit, Exh 28).

**17.** Procedures for employer-initiated separation included an administrative track, whereby an at-will employee was given an opportunity to improve over a period of time but "conditions of employment" such as absences and personal behavior were taken into account in measuring an employee's performance.

**18.** I make no determination of the validity of the employer's medical assessment. Such a finding is not necessary to my decision on this summary judgment motion since I assume without deciding that plaintiff was handicapped.

**19.** See Sealed Exh 6 (Pl Aff, Exh 13); *Misek–Falkoff v. IBM*, 144 F.R.D. 48 (S.D.N.Y.1992).

such action on the grounds that plaintiff was just getting back from a physical illness and should be given another chance.

On March 27, 1987 plaintiff became so upset that she was carried to the medical department, and was later driven to her physician's office. In a state court action against the employer prior to this federal litigation, plaintiff characterized this incident as follows:

> ... [Plaintiff] was called to Yorktown on or about March 27, 1987 for a technical meeting with [her manager]. Instead of discussing technical matters [the manager] angrily confronted her with charges that she was a troublemaker because she had used a public utility computer program to try and register for a PC course open to the community.
>
> Since [the computer trainer] was the registrar and had complained to management, [the manager] told this plaintiff that she was now in trouble with four managers. [He] made more cuts in her job at that point.
>
> [Plaintiff] was so emotionally distressed and exhausted by this confrontation that she collapsed in the hallway trying to leave the building, and was taken to the Medical Department quite upset about [her manager's] conduct.
>
> ... [She returned to work] on or about April 7, 1987, following a week of hospitalization consequent to the confrontation with [her manager].[20]

Plaintiff's absences, above average at times in the past, increased in frequency beginning in late 1986. Even disregarding certain disputed absences in early 1987, plaintiff was out of the workforce because of her illnesses for more than the ten percent that would normally trigger an inquiry by the employer. Plaintiff was apparently still upset over the May 1985 altercation with the computer trainer: she was apprehensive about coming to work, and she was absent from the workplace for long periods when events or comments with which she disagreed were presented to or became evident to her.

In April 1987 medical disability was considered again based on increased absences and diminished productivity. A memorandum from plaintiff's manager—not controverted by plaintiff—states that plaintiff's absences contributed to a five-month delay in introducing to the market a product on which plaintiff was working.[21]

In late May, 1987 plaintiff was injured in a traffic accident.[22] She reported to work but was then absent again, with the exception of a week or so in June, recuperating from the accident and taking a week's vacation, with an anticipated return of July 6, 1987.

A review by the employer in June 1987 led to a decision to place plaintiff on medical disability. In preparation for speaking with plaintiff, her personnel supervisor was advised that if she said "I want to quit," the proper response was "no matter what she says, or does, this will be handled as a medical disability income plan—not voluntary resignation."

On July 6, 1987 after unsuccessful attempts to meet with plaintiff, the Director of Computing Systems notified her by telephone at home that she had been placed on the employer's Medical Disability Insurance Plan on a mandatory basis and could not return to work. Plaintiff was told in a letter dated July 6, 1987 that the decision was made "in light of your medical history after careful consideration of your high absence record, your periodic disruptive, unbusinesslike conduct at work and your inability to perform the requirements of your position consistently." [23]

She was in fact placed on inactive status that day, with the option of accepting or rejecting the benefits available under the

---

**20.** Def's Notice of Motion, Exh E (Amended Complaint in *Misek–Falkoff v. IBM*, Index No. 7720/88, New York Supreme Court, Westchester County (1988, Guranian, J.) at ¶¶ 55, 56); Pl Sur-reply Aff at ¶ 16.

**21.** See Scaled Exh 7 (Def Notice of Motion Exh G). The manager died in the fall of 1987.

**22.** The nature of plaintiff's injuries has not been specified.

**23.** Pl Sur-reply Aff, Exh 1.

employer's disability plan. Plaintiff's benefits under the plan include 40% of salary as well as dental and medical health benefits until the age of 65, and retirement benefits thereafter. Plaintiff has accepted these benefits.

Plaintiff alleges that she suffered a nervous breakdown on the day she received notice of her placement on the disability plan, and that while hospitalized she had a heart attack.

Plaintiff asserts that the mandatory disability decision and the events surrounding it indicate that she cannot resign, but she has not attempted to do so.

The employer's handbook states under the heading "Termination of Employment":

[The employer] has not established any specific term of employment; therefore, termination may be initiated at any time by either an employee or by management. If you initiate the separation, it is considered a voluntary resignation ...

Separation may also be initiated by management. Reasons for separation may include, but are not limited to: failing to meet [the employer's] performance, punctuality or attendance standards, engaging in misconduct or violating a company policy.[24]

### III

Prior to the filing of this federal litigation,[25] plaintiff brought three cases in state court against the employer and/or its employees in connection with the events set forth above:

1. In June 1986, plaintiff sued the computer trainer for defamation and intentional infliction of emotional distress relating to the May 29, 1985 incident; the computer trainer counterclaimed alleging assault.[26] The case was dismissed by the lower court in 1988. In September 1989 the state appellate court affirmed the lower court's dismissal of the claims for intentional infliction of emotional distress and slander but reversed a granting of summary judgment on other claims relating to defamation. 153 A.D.2d 841, 545 N.Y.S.2d 360 (2d Dep't 1989). On remand, the case went to trial in October 1993 with respect to the surviving claims and the complaint was dismissed. Plaintiff's appeal of that decision is pending.[27]

2. In May 1988, plaintiff sued the employer and one of her former managers in state court, alleging that during the three years prior to her being placed on disability the defendants had "engaged in a campaign of tortious infliction of emotional distress" against her.[28] This case was assigned to the same state court judge as the suit against the computer trainer cited above. The appellate court affirmed the lower court's dismissal of plaintiff's claims, 162 A.D.2d 211, 556 N.Y.S.2d 331 (1st Dep't 1990). The New York Court of Appeals denied an appeal, 76 N.Y.2d 708, 560 N.Y.S.2d 990, 561 N.E.2d 890 (1990) (Table).[29]

---

**24.** Def. Reply Aff., Exh L.

**25.** On July 10, 1989, plaintiff filed a complaint identical in all respects to the present complaint but naming in addition to the employer five of its employees (89 Civ 4663), see Def Reply Aff, Exh B; this complaint was neither served nor amended. Instead, the complaint in the present case (89 Civ 6269) naming only the employer was filed as a new action on September 22, 1989.

**26.** *Misek–Falkoff v. Keller*, Index No. 17918/86, New York Supreme Court, Westchester County (1986, Guranian, J.)

**27.** Letter from William E. Weber, Dec 1, 1993, Dkt # 90 at 2.

**28.** *Misek–Falkoff v. International Business Machines Corporation*, Index No. 7720/88, New York Supreme Court, Westchester County (1988, Guranian, J.)

**29.** On October 13, 1993, after obtaining new counsel, plaintiff applied to the state court judge for relief under NY CPLR 5015(a) apparently from that judge's dismissal of both the case against the computer trainer and the employment action against the employer, both cases having been originally decided by him. Plaintiff alleged that certain documents, uncovered later during discovery in this federal litigation, raised questions as to plaintiff's employment-at-will status, and were fraudulently withheld from the state court by the employer.

Plaintiff's application was denied as untimely and on the merits on the grounds that the information would not have changed any decision.

3. In July 1988, plaintiff brought an action against the employer seeking an injunction compelling the employer to train her and permit her access to and use of the employer's computer facilities and personnel so that she personally could search for and retrieve massive amounts of allegedly personal data that she had placed in the employer's computer systems. This lawsuit was dismissed in April 1991 but the employer was enjoined from destroying any of plaintiff's records.[30] An appeal is pending.

## VI

The employer seeks to dismiss plaintiff's claims on the grounds of *res judicata*, based on plaintiff's prior state court action, *Misek–Falkoff v. International Business Machines Corporation*, Index No. 7720/88, New York Supreme Court, Westchester County (1988, Guranian, J.), (the "May, 1988 state court lawsuit"), in which plaintiff's claims have been dismissed with finality.

■■■ Congress has provided that a state court's judgment shall have the same full faith and credit in federal court as in the courts of the state. 28 U.S.C. § 1738 mandates that a federal court apply, where appropriate, the state court's standard of *res judicata*.[31] See *Migra v. Warren City School District Bd. of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir 1994); *Antonsen v. Ward*, 943 F.2d 198 (2d Cir.1991). The preclusive effect of a failure to raise a civil rights claim that could have been but was not raised in an earlier state proceeding that went to judgment is similar to that concerning any other claim. *Migra*, 465 U.S. at 83–85, 104 S.Ct. at 897–898 (42 USC 1983).

■■■ New York law uses a pragmatic analysis for testing whether a succeeding lawsuit is barred because based on the same set of underlying facts. *Smith v. Russell Sage College*, 54 N.Y.2d 185, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 749 (1981). A cause of action which cannot be revived once dismissed "may denote one of several separately stated claims in a pleading based on the same congeries of facts but related to different legal theories of recovery. A 'cause of action' may also denote a separately stated claim on the same congeries of facts, but for different legal relief. But even if there are variations in the facts alleged, or different relief is sought, the separately stated 'causes of action' may nevertheless be grounded on the same gravamen of the wrong upon which the actions is brought." *Smith*, 445 N.Y.S.2d at 71, 429 N.E.2d at 749, quoting *Matter of Reilly v. Reid*, 45 N.Y.2d 24, 407 N.Y.S.2d 645, 648, 379 N.E.2d 172, 175 (1978).

Even when different legal theories depend on "shadings of the facts, or would emphasize different elements of the facts or would call for different measures of liability or different kinds of relief," *Smith*, 445 N.Y.S.2d at 71, 429 N.E.2d at 71, the subsequent claim may be barred. The analysis depends on how "the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether ... their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.*

The underlying factual allegations as to the conduct of the employer were substantially identical in the state court litigation filed against the employer in May, 1988 and in this later federal case. No new facts not in existence or known to the plaintiff in 1988 were alleged in this subsequent federal action, see *175 East 74th Corporation v. Hartford Accident & Indemnity Co.*, 51 N.Y.2d 585, 590, 435 N.Y.S.2d 584, 586, 416 N.E.2d 584, 585 (1980).

The amended complaint in the May, 1988 state court action alleged a "campaign" of harassment beginning in 1984, one year further back in time than is alleged in the present federal complaint but including the May and June 1985 incidents and details of plaintiff's interaction with her managers over the next several years. The state complaint

---

**30.** *Misek–Falkoff v. International Business Machines Corporation*, Index No. 9938/88, New York Supreme Court, Westchester County, NY Law Journal, May 9, 1991.

**31.** The distinctions between different forms of preclusion such as claim, issue, *res judicata* narrowly defined, and related doctrines need not be discussed here.

referred to plaintiff's "brain stem surgery" to ameliorate her neurological condition, and set forth facts relating to plaintiff's being placed on permanent disability without her knowledge. Allegations in that complaint also included the employer's telephone call to her on July 6 1987, and plaintiff's reaction to these events resulting in an alleged nervous breakdown and heart attack.

Plaintiff's first two claims in the May, 1988 state court action were dismissed on statute of limitations grounds pursuant to NY CPLR 3211(a)(5). Limitations of actions, often called procedural, "in a practical sense may also be said to be substantive." *Smith*, 445 N.Y.S.2d at 72, 429 N.E.2d at 750; see *Koeppel v. Wachtler*, 183 A.D.2d 829, 583 N.Y.S.2d 977, 978 (2d Dep't 1992). The balance of plaintiff's claims in the state court action were dismissed, based on the pleadings, for failure to state a claim under NY CPLR 3211(a)(7). The dismissal was not merely because of technical pleading defects but on the merits. *Feigen v. Advance Capital Mgt. Corp.*, 146 A.D.2d 556, 536 N.Y.S.2d 786, 788 (1st Dep't 1989); see *Slavin v. Fischer*, 160 A.D.2d 934, 554 N.Y.S.2d 659, 661 (2d Dep't 1990). Plaintiff did not seek to replead, although she was aware that discrimination based upon handicap was a basis for legal action.[32] There is nothing in the record, nor has any authority been cited or found, to suggest that plaintiff's claim under the Act, or her pendent state claims, could not have been pursued in the 1988 state court action.

■ Plaintiff's state court action has been brought to a final conclusion by the ruling of the state's highest court. *Misek–Falkoff v. International Business Machines*, 76 N.Y.2d 708, 560 N.Y.S.2d 990, 561 N.E.2d 890 (1990) (Table). And even had the 1988 state court suit not been dismissed, the current factually duplicate lawsuit would be improper under *Smith*.

Not only could plaintiff here have raised all of her claims in state court; she also had the choice of proceeding initially in federal court, an option she failed to exercise. *Migra v. Warren City School District Bd. of Edu-*

cation, 465 U.S. 75, 85 n. 7, 104 S.Ct. 892, 898 n. 7, 79 L.Ed.2d 56 (1984). Thus even if based on different theories or seeking a different remedy, this federal action is barred. To permit plaintiff to proceed with this action would defeat the purposes of claim preclusion. It would permit a disappointed litigant to resort to federal court to trump the state judicial system where the litigant chose to bring the initial litigation and fully exercised the opportunity to litigate the case. See *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981).

Thus plaintiff's federal claim in this action, barred by principles of *res judicata*, is dismissed.

Under *Smith*, 445 N.Y.S.2d at 71, 429 N.E.2d at 749, plaintiff's claims asserting discrimination in violation of New York Executive Law 296(1)(a) and New York Civil Rights Law 40-c are also barred. Were that not the case, having dismissed the federal discrimination claim I would decline to assert supplemental jurisdiction over plaintiffs' state law claims. See 28 U.S.C. § 1367(c)(3); see also note 1 above.

## V

■ Summary judgment on the merits of claims is appropriate if there are no genuine issues of material fact and the moving party establishes its right to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tri–Star Pictures, Inc. v. Leisure Time Production, B.V.*, 17 F.3d 38, 42–43 (2d Cir.1994). In order to defeat a motion for summary judgment properly supported by the moving party, the nonmoving party must establish a genuine issue of material fact. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The purpose of the motion is to determine whether there is a genuine issue requiring a trial. A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

**32.** See complaint in this action, ¶ 14 ("In or about April 1985, [plaintiff] began to inquire of [the employer] whether she might be a person with handicaps within the meaning of the ... Act.")

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); see *Converse v. General Motors Corp.,* 893 F.2d 513, 514 (2d Cir.1990).

■ The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). The non-moving party may not defeat a motion for summary judgment by relying "simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. New York,* 996 F.2d 522, 532 (2d Cir.1993); *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). The nonmoving party bearing the burden of proof on the issue at trial must designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, quoting Fed.R.Civ.P. 56(e). At the same time, all ambiguities must be resolved and reasonable inferences drawn in favor of the nonmoving party. *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

## VI

Summary judgment is granted with respect to plaintiff's claim under the Rehabilitation Act.

■ The Rehabilitation Act (the "Act"), 29 U.S.C. § 701 *et seq.,* reflects the concern of Congress with "protecting the handicapped against discrimination stemming not only from simple prejudice, but also from 'archaic attitudes and laws' and from 'the fact that the American people are simply unfamiliar with and insensitive to the difficulties confront[ing] individuals with handicaps.' " *School Bd of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987). A primary purpose of the Act is to "deter discrimination against handicapped individuals and to expand their employment opportunities and their integration into society." *Gilbert v. Frank,* 949

F.2d 637, 639–40 (2d Cir.1991). This broad framework does not, however, prevent an employer from making decisions "based on the job-related attributes of a person's handicaps." *Teahan v. Metro–North Commuter R. Co.,* 951 F.2d 511, 513 (2d Cir.1991), *cert. denied* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992).

■ Plaintiff's job was a sensitive one requiring intensive cooperation with other staff members and reliability in performing under time constraints. Does prohibited discrimination arise where a handicapped employee, qualified to perform the technical functions of her job but unable to get along with coworkers and management or to perform effectively in a timely manner, is placed on mandatory inactive status?

■ To establish a prima facie case under Section 504 of the Act, 29 U.S.C. § 794, plaintiff must show that at the time of placement on permanent disability she was (1) handicapped within the meaning of the Act, (2) "otherwise qualified" to perform the essential functions of her given position, (3) placed on inactive status solely by reason of her handicaps, and (4) that the employer was a recipient of federal financial assistance.[33] 29 U.S.C. § 794; see *Bates v. Long Island RR,* 997 F.2d 1028, 1035 (2d Cir), *cert. denied* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *Doe v. New York University,* 666 F.2d 761, 774–76 (2d Cir.1981).

■ The Act defines a "handicapped" person as an individual "who (i) has a physical or mental impairment that substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B). Work qualifies as a major life activity if the individual is significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. See *Doe v. New York University,* 666 F.2d at 775; 45 CFR 84.3(j)(2)(ii).

---

**33.** The employer does not challenge this fourth element of plaintiff's claim.

Plaintiff's position is that her handicap was limited to her neurological disorder and that she was discriminated against on that basis. For purposes of ruling on this motion, I assume that plaintiff was handicapped.

■■■ Was plaintiff qualified to perform the essential functions of her position, despite disability? See *School Bd of Nassau County v. Arline*, 480 U.S. 273, 285, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) ("the definition of 'handicapped individual' is broad, but only those individuals who are both handicapped *and* otherwise qualified are eligible for relief") (emphasis in original); *Doe v. New York University*, 666 F.2d 761, 775 (2d Cir.1981). The Supreme Court has interpreted the phrase "otherwise qualified" to refer to "one who is able to meet all of a program's requirements in spite of . . . handicap." *Arline*, 480 U.S. at 287 n 17, 107 S.Ct. at 1131 n. 17; *Gilbert v. Frank*, 949 F.2d 637, 641 (2d Cir.1991).

To be qualified, the individual must satisfy the requisite skill, experience, education and other job-related requirements of the employment position and must be able to perform the essential functions of the position, with or without reasonable accommodation. *Arline*, 480 U.S. at 287 n 17, 107 S.Ct. at 1131 n. 17; 45 CFR 84.3(k) (1985); *Gilbert*, 949 F.2d at 641; *Matzo v. Postmaster General*, 685 F.Supp. 260, 263 (DDC 1987), *aff'd.* 861 F.2d 1290 (DC Cir.1988).

In the present case, plaintiff satisfied the skill, education and experience requirements of the job. Plaintiff's performance appraisals did not indicate any problems or deficiencies in those areas and indeed did not mention outbursts or difficulties in getting along with other people at the workplace.

■■■ Where dismissal is based on factors covered by a positive job appraisal, the appraisal becomes suspect, as do the articulated reasons for dismissal. One may draw the inference that the reasons given are pretextual and that the employee was in fact fired (or in this case placed upon permanent disability) because of her handicap. See *Os-*

*trowski v. Atlantic Mutual Ins Companies*, 968 F.2d 171, 182 (2d Cir.1992).

The employer's personnel policy encompassed two separate types of employee evaluation, one being periodic written appraisals of job performance based on the employee's duties and responsibilities, and on goals to be achieved on the job, including significant positive or negative influence that the employee had on the job performance of others. In contrast, managers were to identify separately and deal early with problems relating to "conditions of employment" including attendance and personal conduct. The employer's personnel materials indicate that conditions of employment were generally considered to be those which did not impact the technical aspects of performance.[34]

■■■ Whether or not plaintiff was "otherwise qualified" to perform the essential functions of the job turns on the significance of absences and interpersonal relations, factors the employer cites as the basis for decline in plaintiff's ability to perform, and as the reasons for her ultimate removal from active employment, in light of the employer's official job description for a staff systems analyst and office educator. See *Overton v. Reilly*, 977 F.2d 1190, 1195 (7th Cir.1992) (employer's job description relevant to determination of essential functions of the job); *Schmidt v. Bell*, 1983 WL 631, *9, 33 Fair Empl Prac Cas (BNA) 839 (DC Pa 1983) ("Deference must be given to the decision of those persons who are in the best position to evaluate whether the individual is able to fulfill the essential functions of the position in spite of the handicap."); EEOC Title I Regulations (employer's judgment as to what the essential functions of the job are can be considered).

By plaintiff's own definition of her duties at deposition, her actual presence in the workplace and predictable availability were essential so that projects could be developed against deadlines important to the employer; so that new systems could be tested in collaboration with other employees; and so that

---

**34.** Plaintiff points out that the employer's personnel policy requires managers to make early identification of problems with regard to conditions of employment, and to make efforts to rectify them.

plaintiff was available to attend planning meetings and training sessions. "Some degree of regular, predictable attendance is fundamental to most jobs," *Walders v. Garrett*, 765 F.Supp. 303, 310 (E.D.Va.1991), *aff'd.* 956 F.2d 1163 (4th Cir.1992), and particularly to a job in an organizational setting in which assignments may require team interaction for project development within a timeframe relating to marketing of the product.

What is most significant, however, is not absences as such, but whether or not the job is completed in a timely manner in light of the work involved. See *United States EEOC v. AIC Security Investigation, Ltd.*, 820 F.Supp. 1060, 1064 (N.D.Ill.1993) ("What is material is that the job gets done ... This is necessarily a fact intensive determination.") Plaintiff was supposed to function as a component of a research facility developing and testing technically sophisticated products.

█ It is certainly a "job-related requirement" that an employee, handicapped or not, be able to get along with co-workers and supervisors. Thus, conduct associated with a handicap, as distinct from the handicap itself, may be relevant to the determination of whether a person is qualified. *Teahan v. Metro–North Commuter R. Co.*, 951 F.2d 511, 517 (2d Cir.1991), *cert. denied* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992); see *Doe v. Region 13 Mental Health–Mental Retardation Comm'n*, 704 F.2d 1402, 1408 (5th Cir.1983).

█ An employer may certainly require an employee's presence at the workplace when interaction with others is essential to the task to be performed; the employer may also require that employees, whether handicapped or not, not cause, or contribute to, undue interruptions and hostility in the workplace. See *Schmidt v. Bell*, 1983 WL 631, *14, 33 Fair Empl Prac Cas (BNA) 839 (DC Pa 1983) ("Mr. Schmidt's post traumatic stress disorder is manifested by his resentment of any type of authority.... His volatile, explosive personality is exacerbated under stress and [his job] is inherently stressful. His handicap presents an insurmountable barrier to his employment.").

█ Plaintiff denies that she was the cause of the 1985 disruptions. She does, however, admit to at least one physically aggressive act in May 1985; to on-going disagreement with her managers and other employees; to unwillingness to cooperate with management decisions as to how to resolve past incidents; and to mistrust of her managers after learning that the employer provided legal services to the computer trainer in connection with her suit against him. She was concededly absent from the workplace for extended periods of time. See *Guice–Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir.1992) (head nurse unable to come to work until two hours after others because of disability not "otherwise qualified" because no management person would be available).

These factors are sufficient to support the employer's action, unless the employer's ultimate decision was a pretext for discrimination against plaintiff on the basis of handicap. See *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Doe v. Region 13 Mental Health–Mental Retard. Com'n*, 704 F.2d 1402, 1408–09 (5th Cir.1983); *Carr v. Barr*, 1992 WL 159191, *4 (D.D.C.1992).

One fact in the record which may support plaintiff's contention that some inappropriate factor—although not necessarily plaintiff's handicap—was in the minds of some of the employer's personnel is a notation in a document made by a single member of the first disability panel review committee in February 1986, stating: "Had no problem with case. 'Someone not unsat [unsatisfactory] today—can you force her out of business.' Yes. MDIP." See *Misek–Falkoff v. International Business Machines*, 144 F.R.D. 48, 49 (S.D.N.Y.1992).

In context, however, the notation is not persuasive of discriminatory intent. The company's decisionmakers creditably rejected this suggestion in 1986, and plaintiff continued to be an employee. It was not until more than a year later, in June 1987, that the decision was taken to place plaintiff on disability: in the interim additional persistent problems had been experienced with plaintiff not related to technical competence but to

inability to get along in the workplace, and to unpredictable, extended absences from the workplace.[35]

Where there are external indications of serious difficulties in the interaction between an employee and other employees and staff of the employer, as is the case here, the reality of perceptions of the supervisors, regardless of the correctness of those perceptions, presents a problem for the employer.[36]

■ If reasonable accommodation can enable an otherwise qualified plaintiff to perform the essential functions of a job, the employer must provide it. *School Bd of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991); *Treadwell v. Alexander,* 707 F.2d 473, 477 (11th Cir.1983).

■ Accommodation is not reasonable if it "either imposes 'undue financial and administrative burdens,' or requires a 'fundamental alteration in the nature of [the] program.'" *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17, quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 2369, 2370, 60 L.Ed.2d 980 (1979).

A plaintiff has the initial burden of coming forward with at least a facial showing that the handicap can be accommodated. *Gilbert,* 949 F.2d at 642. Plaintiff asserts that she could be accommodated by being permitted to work at home, which appears at first glance to be reasonable because the employer's business is computer research and development.

■ Work at home does not create total insulation from supervisors or coworkers.

Personal contact would still be required at critical junctures, triggering chances of recurrent outbursts. Plaintiff required training, and a trainer could not effectively provide training to plaintiff at home and, in any case, teaching requires the type of interaction that is at issue here. An employer is not required to accommodate a disabled employee by eliminating one of the essential functions of a job. *Gilbert,* 949 F.2d at 642; *Hall v. United States Postal Service,* 857 F.2d 1073, 1078 (6th Cir.1988); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985).

■ The employer made reasonable accommodations by allowing plaintiff to rest in the medical department during the day, to park in handicapped parking areas whenever requested, to take extended absences for medical reasons, and to work part-time and "to tolerance" as needed. The employer also changed her office from time to time at her request, and permitted her to attend law school at night although she was not always coming to work during the day.

■ Plaintiff has asserted that these accommodations were inadequate and unacceptable. A plaintiff may not, however, complain successfully about the employer's choices if reasonable. "That [the employer] could have provided a different set of reasonable accommodations or more accommodations does not establish that the accommodations provided were unreasonable or that ... additional accommodations were necessary." *Wynne v. Tufts Univ. School of Med.,* 1992 WL 46077 (D.Mass.1992), *aff'd.* 976 F.2d 791 (1st Cir.1992), *cert. denied* — U.S. —, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).[37]

**SO ORDERED.**

---

**35.** Plaintiff has complained that she did not have advance notice of the possibility that she would be found to be disabled. Lack of such notice could justify criticism of the employer's policy, but notice would not have had any possibility of resolving the problem.

**36.** See Sealed Exh 7 (Def's Notion of Motion, Exh G).

**37.** Plaintiff has asserted that the process by which the employer removed her from active employment meant that she was unable to resign

and that her status as an at-will employee was thereby abrogated.

Under *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86 (1983), an at-will employee in New York may be discharged for cause or no cause, "absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment." Id., 461 N.Y.S.2d at 237, 448 N.E.2d at 91.

In keeping with the Thirteenth Amendment ban on involuntary servitude, the employer had no authority to prevent the plaintiff from resign-

INDEX OF SEALED COURT EXHIBITS TO MEMORANDUM ORDER

| Exhibit No. | Footnote | Source |
|---|---|---|
| 1 | 8 | Def's Notice of Motion, Exh I |
| 2 | 11, 12 | Def's Notice of Motion, Exh O |
| 3 | 13 | Def's Notice of Motion, Exh P |
| 4 | 15 | Def's Reply Aff, Exh E |
| 5 | 16 | Pl's Aff, Exh 28 |
| 6 | 19 | Pl's Aff, Exh 13 |
| 7 | 21, 36 | Def's Notice of Motion, Exh G |

ing, although the employer was not obligated to provide benefits if plaintiff resigned.