Dr. Linda D. MISEK–FALKOFF and Adin D. Falkoff, Plaintiffs,

v.

James J. MCDONALD Jr., Esq. Employee Relations Law Journal, Editorial Board, Employee Relations Law Journal, Fisher and Phillips, LLP, Aspen Publishers, Inc., Defendants.

No. 01 CIV 0816(CLB).

United States District Court, S.D. New York.

Nov. 19, 2001.

Dr. Linda D. Misek–Falkoff, pro se.

Adin D. Falkoff, pro se.

Kenneth P. Norwick, Esq., New York City, for Defendants.

225

*Memorandum & Order*

BRIEANT, District Judge.

In this diversity suit based on defamation and related torts, Defendants by motion filed September 6, 2001, heard and fully submitted on November 16, 2001, moved for an order pursuant to Rule 12(b) F.R.Civ.P.: (1) dismissing the suit for lack of subject matter jurisdiction; (2) dismissing as to James J. McDonald, Jr., and Fisher and Phillips, L.L.P., for lack of personal jurisdiction; (3) dismissing as against McDonald for insufficiency of process; (4) dismissing against Defendants' Employee Relations Law Journal and Editorial Board Employee Relations Law Journal (the "Board") pursuant to Rule 17(b) F.R.Civ.P. for want of capacity to be sued, and; (5) dismissing the Amended Complaint for failure to state a claim.

At the oral argument Plaintiffs conceded that the action must be dismissed against defendants Employee Relations Law Journal and Editorial Board, Employee Relations Law Journal, and that branch of the motion is granted.

In their opposition papers, Plaintiffs seek injunctive relief and also ask this Court to permit them to take discovery if Defendants' motion to dismiss is granted. Finally, in the conclusion of Plaintiffs' opposition submission, they ask this court "in its own terms and on its own timing to consider conduct of Counsel and dispatch it accordingly, by consideration under Federal Rule 11, or simply as advisement of the expected manner conduct including proper representation of case law findings, and decorous personal interaction, as the case presumably moves forward in orderly fashion."

*Background*

The following facts are assumed to be true for purposes of the motion. From

approximately 1977 through June 1987, Plaintiff, Dr. Misek–Falkoff, was actively employed by International Business Machine Corporation ("IBM") in various positions. In 1987, IBM placed Dr. Misek–Falkoff on permanent medical disability leave based, in part, on a "debilitating pain condition of Trigeminal Neuralgia", which she developed in or about 1980 and remained "for some time, grew worse and was finally diagnosed as a physical disorder of the Fifth Cranial nerve". Subsequent to the termination of her active employment with IBM, Dr. Misek–Falkoff (sometimes with her husband Plaintiff, Adin D. Falkoff) filed several lawsuits against various entities, including IBM, that all relate in some manner to this litigation.[1]

### IBM Action

Of the several lawsuits filed by Plaintiff(s), the one most relevant to this case is *Misek–Falkoff v. International Business Machines Corporation,* 854 F.Supp. 215 (S.D.N.Y.1994) (Broderick, J.) affirmed 60 F.3d 811 (2d Cir.1995), (hereinafter, the "IBM Action"). In the IBM Action, Plaintiffs alleged, *inter alia,* that IBM had violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by placing Dr. Misek–Falkoff on permanent disability status. *Id.* Specifically, Dr. Misek–Falkoff argued that as a result of her neurological disorder she was "handicapped" for purposes of the Act, and that IBM placed her on inactive status *only* because of her handicap and, thus, violated the statute.

Ultimately, Judge Broderick rejected Dr. Misek–Falkoff's claim. In so doing, Judge Broderick first explained that under the Rehabilitation Act, Plaintiff was entitled to relief only if she were *both* handicapped *and* otherwise qualified to perform the essential duties of her position. Assuming for purposes of IBM's summary judgment motion that Dr. Misek–Falkoff was handicapped, Judge Broderick concluded that she was not otherwise qualified and granted IBM summary judgment. Judge Broderick held:

> Through at least the last seven years of her employment [Dr. Misek–Falkoff] suffered from sharp head pains and other symptoms associated with atypical trigeminal neuralgia, a disorder of the nervous system, and she had attacks at unpredictable times. Plaintiff was in frequent communication with the employer's medical department, as were her own physicians, and plaintiff often worked "to tolerance" (that is, as much as possible) or for half-days. Plaintiff sometimes worked at home but not on a regular basis.

> Beginning in 1984, plaintiff's medical condition worsened. She was frequently absent, sometimes for extended periods, due among other things to hospitalization in connection with medical tests and brain surgery in July of 1985, and to

1. The following are list of Plaintiffs other cases: *Misek–Falkoff v. IBM,* 162 A.D.2d 211, 556 N.Y.S.2d 331 (1st Dept.), *lv to appeal denied,* 561 N.E.2d 890, 560 N.Y.S.2d 990, 76 N.Y.2d 708 (1990) (tort action against IBM dismissed); *Misek–Falkoff v. IBM,* Index No. 9938/88, New York Supreme Court, Westchester County, N.Y. Law Journal, May 9, 1991 (action against IBM seeking injunctive relief dismissed); *Misek–Falkoff v. Keller,* 153 A.D.2d 841, 545 N.Y.S.2d 360 (2d Dept.1989) (tort action against employee of IBM dismissed); *Misek–Falkoff v. IBM,* 854 F.Supp. 215 (S.D.N.Y.1994), *aff'd,* 60 F.3d 811 (2d Cir.1995), *petition for rehearing denied,* 517 U.S 1230, 116 S.Ct. 1871, 134 L.Ed.2d 968 (1996) (discussed herein); *Misek–Falkoff v. Village of Pleasantville,* 207 A.D.2d 332, 615 N.Y.S.2d 422 (2d Dept.1994) (action against Village dismissed); *Misek–Falkoff v. Donovan,* 250 A.D.2d 579, 671 N.Y.S.2d 986 (2d Dept. 1998) (action against State Supreme Court Justice dismissed); *Misek–Falkoff v. American Lawyer Media, Inc.,* Index No. 103099/00, Supreme Court, New York County (motion to dismiss defamation action *sub judice.*)

emotional reactions to work-related experiences. She received satisfactory personnel appraisals in June 1982, August 1983, September 1984, and December 1986.

[Notwithstanding], [e]ven when plaintiff was present in the workplace there were problems: plaintiff at times exhibited fits of rage, emotional outbursts, crying episodes and similar behavior, making it difficult if not impossible for many co-workers and supervisors to get along with her. The extent to which these episodes were directly related to, the result of, or independent of her physical condition is unclear.

An incident triggering events leading to this lawsuit occurred on May 29, 1985. When the departmental computer trainer failed to include plaintiff in a training session, an altercation erupted. The computer trainer transmitted an account to his manager and others by electronic mail alleging that plaintiff had attempted to assault him. Plaintiff vigorously denies the computer trainer's version of this incident: plaintiff claims that at most she brought her hand down "in frustration" on a table next to the place where the computer trainer was sitting, denting some slides in a binder. Both employees appear to have been shaken by the incident, as was a third employee, who observed the encounter and claimed thereafter to be afraid of plaintiff.

Several weeks later, plaintiff was involved in a second incident, this time with her manager, in which plaintiff claims that the manager grabbed from plaintiff's hand a telephone which then brushed plaintiff's face. Believing that she had been assaulted, plaintiff called for help from the building security and medical departments. Immediately after this affair, the manager requested to be relieved from supervising plaintiff

and was replaced by a more senior manager.

[I]n the summer of 1985, plaintiff had neurological brain surgery and was out of work for three months. Upon her return in mid-October 1985, ... Plaintiff's managers determined that plaintiff should be handled "from a medical standpoint." This approach was developed as a result of two personnel investigations.

Mandatory disability had been first considered with respect to plaintiff in early 1986. Plaintiff's managers had bypassed the administrative approach leading to possible termination without benefits and applied instead, in accordance with company policy, for her placement on the employer's Mandatory Disability Insurance Plan . . . .

In April 1987 medical disability was [first] considered again based on [Dr. Misek–Falkoff's] increased absences and diminished productivity. A review by the employer in June 1987 led to a decision to place plaintiff on medical disability.

On July 6, 1987 after unsuccessful attempts to meet with plaintiff, the Director of Computing Systems notified her by telephone at home that she had been placed on the employer's Medical Disability Insurance Plan on a mandatory basis and could not return to work. Plaintiff was told in a letter dated July 6, 1987 that the decision was made "in light of your medical history after careful consideration of your high absence record, your periodic disruptive, unbusiness-like conduct at work and your inability to perform the requirements of your position consistently."

She was in fact placed on inactive status that day, with the option of accepting or rejecting the benefits available under the employer's disability plan. Plain-

tiff's benefits under the plan include 40% of salary as well as dental and medical health benefits until the age of 65, and retirement benefits thereafter. Plaintiff has accepted these benefits.

### Employee Relations Law Journal Article

Defendant McDonald, a citizen and resident of the State of California,[2] is a lawyer and partner in the Irvine, California law office of Defendant Fisher & Phillips, and an author of a column entitled "Lex Mentis" that appears in the quarterly journal of Defendant Employee Relations Law Journal. *See* McDonald Dec. at ¶¶ 2 & 5. The Employee Relations Law Journal is part of Defendant, Aspen Publishers, Inc.'s ("Aspen"), "Law and Business II" publishing unit. *See* Declaration of Jane Butler, dated September 5, 2001, ("Butler Dec.") at ¶ 4. Aspen's Law and Business II unit is based and run out of Aspen's New York office, which Jane Butler, Aspen's President and CEO, states is Aspen's principal place of business. *Id.* ¶¶ 2 & 5.

Mr. McDonald prepares and writes each article for his column in California. Upon completion, Mr. McDonald e-mails his drafts to Dianne Scent, an Editor of the Law Journal, who resides and works in Piscataway, New Jersey. Thereafter, Ms. Scent and Mr. McDonald communicate by phone and e-mail, and Mr. McDonald sends a hard copy of all final drafts via mail to Ms. Scent in New Jersey[3]. *See id.* ¶ 6.

In the Spring of 2000, following the exact procedures described above, Mr. McDonald authored an article entitled "The Americans With Difficult Personalities

Act", which is the subject of this lawsuit. In that article, which the Court considers to be a parody, or a criticism of recent tort litigation in the field of employment, Mr. McDonald wrote in pertinent part:

In *Misek–Falkoff v. IBM Corp.*, 854 F.Supp. 215 (S.D.N.Y.1994), affirmed, 60 F.3d 811 (2d Cir.1995), the plaintiff was placed on permanent disability status after a series of emotional outbursts, fits of rage, and altercations with supervisors and coworkers. She sued, alleging that she was discriminated against on account of her mental disability, but her suit was rejected. The court assumed that the plaintiff was disabled but went on to hold that she was nonetheless unqualified for her job, even though she may have been technically competent. The court observed that it is a requirement of any job that any employee— disabled or not—be able to get along with coworkers and supervisors, and that an employer certainly may require its employees not to cause or contribute to disruptions and hostility in the workplace.

As a result of this language and its appearance in the Employee Relations Law Journal as well as on the World Wide Web, Plaintiffs have sued McDonald (as well as the other Defendants) for Defamation, with alternate legal theories also pleaded.

In addition to writing the "Lex Mentis" column for the Employee Relations Law Journal, Mr. McDonald is also listed on its "Editorial Advisory Board." Although technically a Board member, Mr. McDonald avers that the Board never meets as an entity and, as far as he knows, the

---

**2.** *See* Declaration of James J. McDonald, Jr., dated September 4, 2001, (the "McDonald Dec.") at ¶ 2.

**3.** In his declaration submitted in support of Defendants' motion, Mr. McDonald also states that he receives no compensation for

writing the Lex Mentis column, has "no contact whatsoever with any person or entity located within the State of New York in the course of preparing, writing, or proofing the Lex Mentis column." McDonald Dec. at ¶ 6.

Board "had no separate existence as an entity and no responsibilities or authority of any kind[4]." McDonald Dec. at ¶ 7. Moreover, Mr. McDonald's sole activity as a Board member was to comment on proposed articles of other authors.

### Discussion

#### A. Subject Matter Jurisdiction

Defendants argue that complete diversity as required by 28 U.S.C. § 1332 is absent because the citizenship of Defendant Aspen Publishers, Inc. for purposes of the statute, is New York. This is so, according to Defendants, because Aspen, incorporated in Delaware, has its principal place of business in New York. Defendants have submitted Declarations from Jane Butler, President and CEO of Aspen and James O'Shea, Associate Publisher of Aspen's Law & Business II publishing unit, both declaring that this is so.[5]

■ In response, Plaintiffs argue and this court concludes that on February 1, 2001, the date Plaintiffs commenced this action, Aspen's corporate headquarters was in Gaithersburg, Maryland. Aspen, which held itself out to the public as having its principal office in Maryland, moved its corporate headquarters to New York thereafter. This branch of the motion is denied.

#### B. Personal Jurisdiction

Defendants contend that this Court lacks personal jurisdiction over Defendants McDonald and Fisher & Phillips. In Plaintiffs' Amended Complaint, they allege:

Personal Jurisdiction over Defendants McDonald and Fisher & Phillips, L.L.P. is based on Defendants' transacting and contracting business in New York (C.P.L.R. § 302(a)(1)) by soliciting publications in New York with several publishing houses including Aspen through its Employee Relations Law Journal, of which Board, on information and belief, Mr. McDonald has been or is currently a Member.

On information and belief, Defendants McDonald and Fisher & Phillips further profit from and participate in professional organizations located in New York, and Defendants McDonald and Fisher & Phillips maintain interactive Web Sites, for example inviting New York traffic and revenue through the Web Site: (www) laborlawyers.com and affiliate sites.

With respect to Defendant McDonald, the Declaration submitted by him on behalf of Defendants' motion to dismiss states that these allegations are simply false. In that Declaration McDonald affirms that: (i) he is a citizen and resident of the State of California, (ii) he is employed as a partner in the Irvine, California law office of Defendant Fisher & Phillips, (iii) he does not practice law in New York, (iv) he is not a member of the New York State bar, (v) apart from the article sued on, he does not write any columns or articles for New York publications, (vi) he does not belong to, participate in or profit from any professional New York organizations or associations; nor does he "solicit publications in New York with several publishing houses," and (vii) he is an au-

---

4. Similarly, in a Declaration submitted in support of Defendants' motion ("Shea Dec."), James O' Shea, the Associate Publisher of the Law & Business II publishing unit of Defendant Aspen, stated that the Board "has no structure or separate existence as an entity.

Collectively and individually, it and its 'members' have no responsibility, power, or authority of any kind." Shea Dec at ¶ 6.

5. Paragraph 31 of the Amended Complaint alleges Aspen is a Delaware Corporation.

thor of a column entitled "Lex Mentis" that appears in the quarterly publication of Defendant Employee Relations Law Journal.

With respect to Defendant Fisher & Phillips, McDonald's Declaration states: (i) that he is a partner in Fisher & Phillips, which is headquartered in Atlanta, Georgia, (ii) the firm currently maintains offices in Fort Lauderdale and Orlando, Florida; Oakland, Irvine, and San Diego, California; Las Vegas, Nevada; Chicago, Illinois; and New Orleans, Louisiana; (iii) it has never had an office in New York, (iv) only two or three of the firm's more than 140 lawyers were admitted to practice in New York and none of those lawyers currently has an office for or is otherwise engaged in the active practice of law there, and (v) although the firm maintains a non-interactive website at *www.laborlawyers.com,* nothing in that website is addressed solely or directly to New York.

Finally, Defendants also point out that in April 2000, this Court stated;

> Before proceeding further in this case, Plaintiffs should consider whether personal jurisdiction may be obtained over Defendants in this Court, inasmuch as section 302(a)(2) of the New York CPLR, applicable in this court under Rule 4(e)(1) does not extend to "long arm" service of process on non-residents in an action for defamation.

■ This Court concludes that on the papers presented, Plaintiffs have failed to demonstrate that personal jurisdiction may be asserted over Mr. McDonald individually, or his law firm, either under § 301 or 302 of the New York CPLR, and for this reason the action must be dismissed as to them.

## C. *Failure to State a Claim*

Although pleaded in a multiplicity of forms, the complaint is essentially one for defamation. Since the offending article in *Lex Mentis* is incorporated by reference in the complaint, the Court moves directly to the article itself (found as Exhibit C to the affirmation of Kenneth P. Norwick, filed September 6, 2001).

This article, entitled "The Americans with Difficult Personalities Act," is essentially a parody or a criticism of the federal courts and the current environment in employment litigation.

The author notes that some ten years ago a historical event occurred when the President signed the Americans With Disabilities Act (ADA) with various representatives of the disability community in attendance, including those with sight disabilities and hearing disabilities, and persons in wheelchairs. It is said that "nowhere to be found at the ceremony, however, was there a disgruntled employee flipping off his boss and spewing profanity at his co-workers." The author then points out that "ten years later 'mental disabilities' account for the greatest number of claims brought under the statute, that while some involve recognized mental disorders 'a growing proportion of these claims' involve emotionally troubled employees who cannot handle ordinary job stresses or get along with bosses and co-workers."

The author points out that in the beginning of our experience with the statute, employees who were "rude, insubordinate or disruptive" were almost uniformly excluded from ADA coverage, and that the inability to get along with others was not a covered disability, or else that insubordinate or disruptive conduct made one unqualified for the position. Defendant then refers to "some recent cases" which he writes "have called these basic principles into question" and points out that some courts have held that insubordinate or dis-

ruptive conduct can be protected if it can be blamed on some mental disability.

The article then analyzes the problem of "mindless incrementalism" in the courts and criticizes the drafting of the statute and the "muddled" judicial thinking which has extended its reach in the past decade.

The article then turns to the issue of whether the courts should recognize interacting with others as a major life activity, consistently with statements in the EEOC compliance manual. After citing numerous other reported civil cases in the article, the author reaches the plaintiff, Dr. Misek–Falkoff, for the first time at page 6 of the article. We quote the sub-point in the article, entitled, "My Disability Made Me Do It!"

> Previously, the ADA's requirement that one be qualified for the job in question was used by courts to exclude rude, insubordinate or disruptive employees from coverage under the ADA.
>
> For example, in *Mancini v. General Electric Co.*, 820 F.Supp. 141 (D.Vt. 1993), the plaintiff had numerous conflicts with his bosses and was ultimately terminated for refusing a work assignment. The court rejected his disability claim, maintaining that "the ability to follow the orders of superiors is an essential function of any position." In other words, employees who are insubordinate are not otherwise qualified for the position.
>
> In *Misek–Falkoff v. IBM Corp.*, 854 F.Supp. 215 (S.D.N.Y.1994), *aff'd* 60 F.3d 811 (2d Cir.1995) the Plaintiff was placed on permanent disability status after a series of emotional outbursts, fits of rage and altercations with supervisors and co-workers. She sued, alleging that she was discriminated against, but her suit was rejected. The court assumed that the Plaintiff was disabled, but it went on to hold that she was nonetheless

unqualified for her job, even though she may have been technically competent. The court observed that it is a requirement of any job that an employee—disabled or not—be able to get along with co-workers and supervisors, and that an employer certainly may require its employees not to cause or contribute to disruptions and hostility in the workplace.

This is the sole reference to Plaintiff in the offending article. The quotation noted above is followed by a footnote reference to *Boldini v. Postmaster General*, 928 F.Supp. 125 (D.N.H.1995) in which a psychiatrically disabled plaintiff was found not otherwise qualified for her position because of her repeated defiance of her supervisors' directives and her numerous altercations with co-workers and customers.

This discussion of a reported decision of the late Judge Broderick of this Court, is not so removed from the facts as to lose its First Amendment protection as a fair report of a public judicial proceeding. Dr. Misek–Falkoff's litigation is but one of many which the author decries.

The Court understands that Plaintiffs view the article somewhat differently; that at least from their position the employee suffered severe *physical* pain of neurological origin, and was not a "mental case" or a person suffering a psychiatric disorder. The article characterizes Plaintiff as having presented a legally unworthy claim, and with being disgruntled, rude and insubordinate and mischaracterizes her claim of a physical problem as a mental one.

■ Dr. Misek–Falkoff's criticism of the article is not totally lacking in validity. Her sole remedy is to write an article of her own, in order that the different views of the condition of employment litigation may be resolved in the intellectual marketplace as a result of public discussion, ex-

pected to be "robust" and fully protected as to all participants by the First Amendment. The Court does not perceive any significant stigmatizing effect of the article as claimed by Plaintiffs, but in any event the article is privileged as fair comment on a matter of public interest and for that reason cannot be the subject of a valid defamation claim.

In addition to pleading a claim for defamation, Plaintiffs assert separate "causes of action" for civil rights, invasion of privacy through unlawful appropriation of likeness, false-light publicity, interfering with prospective advantage, intentional and negligent infliction of emotional distress, as well as a claim for loss of consortium asserted by Plaintiff Adin D. Falkoff. All of these separate claims merge in the defamation and do not give rise to any relief from this Court based on separate legal theories.

Because the publication is privileged and not actionable, the complaint is dismissed for failure to state a claim as to defendant Aspen Publishers, Inc. As an alternative ground in addition to the jurisdictional issues discussed above, the Court concludes that it must be dismissed for the same reason as to the author, McDonald, and his law firm.

The Clerk shall file a final judgment.

SO ORDERED.