Joseph **HUSOWITZ**, Plaintiff,

v.

Marvin T. **RUNYON**, Postmaster General, United States Postal Service, Defendant.

No. CV 92–2529 (ETB).

United States District Court, E.D. New York.

Oct. 15, 1996.

Joseph Husowitz, Farmingdale, NY, Pro Se.

Zachary W. Carter, United States Attorney by Rosanne M. Harvey, Assistant U.S. Attorney, Jennifer C. Boal, Assistant U.S. Attorney, Brooklyn, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

BOYLE, United States Magistrate Judge.

In May 1992, the plaintiff *pro se*, Joseph Husowitz, commenced this employment discrimination action, pursuant to the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794 (the "Rehabilitation Act" or "Act"). According to the complaint, the plaintiff alleges that he was unlawfully suspended by the United States Postal Service ("Postal Service" or "defendant") on April 3, 1991, because of his mental disability. However, the relief sought by the plaintiff, as clarified at the trial, does not include reinstatement to his former position since the Postal Service permitted the plaintiff to return to work in May 1992. Plaintiff remained employed by the Postal Service until February 1996, when he was terminated. It is undisputed that during the period of suspension the plaintiff received his regular pay and suffered no loss of seniority rights.

In the complaint, the plaintiff claims that: the Postal Service discriminated against him on the basis of his mental disability by permitting colleagues "to engage in a continuing pattern of harassment" which resulted in (1) the plaintiff's involuntary suspension from duties, with pay; (2) mandatory counseling sessions; (3) hypercritical supervision; and (4) denial of access to post office facilities and equipment required for the plaintiff to perform his duties.

The parties consented to a trial before me, pursuant to 28 U.S.C. § 636(c), and this opinion constitutes my findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

### BACKGROUND

In 1962, Mr. Husowitz was hired by the United States Postal Service in Farmingdale, New York (Tr. 25–26).[1] Although Mr. Husowitz suffers from bi-polar affective disor-

---

1. The abbreviation "Tr." within parentheses refers to the transcript of the trial conducted before me on April 15, 16, and 17, 1996.

der, he has held numerous positions throughout his Postal Service career. During his thirty-four years of service, the plaintiff was assigned to various departments where he performed duties including: mail carrier, special delivery, business reply, vehicles operations maintenance, distribution, bulk mail, and accounting (Tr. 25–26, 485, 497). Mr. Husowitz was well-respected by his colleagues for his experience and exemplary work record (Tr. 26). In 1987, the Postal Service honored the plaintiff with a commendation following his twenty-fifth year of "dedicated service and commitment" (Tr. 25–26); *Plaintiff's Exh. 1.*

By December 1989, however, the bi-polar disorder caused Mr. Husowitz' condition to worsen and he became noticeably depressed, irritable, and outspoken (Tr. 26–27). On December 26, 1989, Mr. Husowitz suffered a severe "depressive episode;" one of the side-effects caused by bi-polar disorder. He sought the assistance of then Farmingdale Postmaster, William J. Maynes, who immediately arranged to have union shop steward, Peter Furgiuele, drive the plaintiff to the Veterans Administration Hospital located in East Northport, New York for treatment (Tr. 27, 166, 384, 514).[2] At the time, Mr. Maynes was unaware that the plaintiff had been previously diagnosed with bi-polar disorder (Tr. 27).

Mr. Husowitz remained hospitalized for five months under the continued care of Dr. Anthony Pelosi, the psychiatrist who had been treating him since 1987 (Tr. 29–30, 449). Dr. Pelosi regularly conducted counseling sessions and prescribed lithium carbonate, a drug generally regarded for minimizing the reoccurrence of bi-polar episodes (Tr. 449, 452–53, 462).

In May 1990, Mr. Husowitz received medical clearance from the Postal Service's medical unit to return to work (Tr. 30–31). It was at this time that Postmaster Maynes learned of Mr. Husowitz' disability because the plaintiff was required to "submit medical evidence of [his] ability to work with or without limitations" *Defendant's Exh. I;* (Tr. 30).[3] The record is devoid of any evidence that there were any limitations placed on the plaintiff's ability to resume his regular duties.

Initially, Mr. Husowitz' transition back to work progressed smoothly (Tr. 31). Shortly following his return, the plaintiff was awarded a position as a Level VI Postage Due (Business Reply) Technician (Tr. 328, 384–85).[4] The Postal Service expressed no immediate concerns about the plaintiff's ability to perform his new duties which included "distributing, weighing, computing and processing all classes and types of postage due mail" in addition to providing technical assistance and guidance to other employees on the work area floor. *Defendant's Exh. B.*[5]

Unfortunately, the situation rapidly deteriorated by January 1991. Louis Pelligrino, Mr. Husowitz' supervisor, had received complaints from as many as seven Postal Service employees[6] regarding inadequate performance by Mr. Husowitz. These complaints ranged from incidents of alleged harassment and verbal threats to the plaintiff's inability to perform his duties (Tr. 32–33, 170, 277, 355). As a result, Mr. Pelligrino began to monitor Mr. Husowitz on a daily basis.

---

**2.** This was the second time that Mr. Husowitz was hospitalized due to the bi-polar disorder. In 1965, while Mr. Husowitz was serving in the military, he was admitted to Walter E. Reed Hospital for treatment (Tr. 31, 492).

**3.** Section 342.1 of the Federal Employee Labor Relations Manual requires federal employees who miss a minimum of 21 days due to illness or serious injury to provide medical evidence of their ability to return to work. *Defendant's Exh. I.*

**4.** Supervisor Louis Pelligrino testified that the vacant position in the Postage Due area was filled by the "senior bidder" process (Tr. 384–85). This means that Mr. Husowitz was awarded the position because he had senior status over all of the other Postal Service employees who had expressed an interest in obtaining the Postage Due position.

**5.** Mr. Maynes described Level VI positions as "lead" positions. Although not supervisory by definition, Level VI employees are placed in charge of the clerks in a particular area on the work floor (Tr. 34).

**6.** The following employees had expressed their dissatisfaction with the plaintiff: William Lamb, Diane Digons, Gregory Pursino, Theresa Rowland, Renee Hertzner, Kevin Ryan, and Maureen Daugherty (Tr. 355).

Mr. Pelligrino testified that the plaintiff was "abrupt and obnoxious" when communicating with his colleagues, and he had become an overall disruptive influence at the post office (Tr. 364, 412). The supervisor further testified that during his periods of observation, Mr. Husowitz failed to perform his duties as a Postage Due Technician. Specifically, Mr. Pelligrino cited to the plaintiff's failure to "provide technical direction" and "to promote leadership and harmony" within his work area. (Tr. 387). Mr. Pelligrino stated that each time a co-worker asked a question, Mr. Husowitz abruptly responded "go see a supervisor" (Tr. 390). In addition to not being where he was supposed to be "[n]ine out of 10 times," Mr. Pelligrino stated that he frequently had to remind the plaintiff of his responsibilities (Tr. 362, 412–13).

The Postal Service offered into evidence the job description for Postage Due Technicians. *Defendant's Exh. B.* Included within the section, entitled "Duties and Responsibilities," are the following provisions:

6. When acting as leader of other employees, [the Postage Due Technician] *provides technical direction* covering such matters as their recording and completion of postage due statements, rates to be applied, recording in trust accounts and similar policies, procedures and regulations.

7. When acting as a leader of other employees, in accordance with general and specific directives of the supervisor, ... [s]upplies leadership necessary to secure maximum interest and effort from the employees: *promotes harmony and cooperation.*

*Defendant's Exh. B. (emphasis added ).*

Mr. Pelligrino testified that he personally found the plaintiff's "rudeness, his being abrupt, his disobeying my orders, his leaving the work room floor without authorization, his constant denial, [and] complaints from other clerks" to be a significant distraction (Tr. 354–55). Mr. Pelligrino attributed Mr. Husowitz' conduct to the plaintiff's "unusual behavior" which included episodes of loud

singing, playing the radio at excessively high volumes, procrastination, disturbing co-workers, and other instances of misconduct and insubordination (Tr. 397–406).

Other employees were also distracted by the plaintiff's behavior. In January or February 1991, Supervisor Pelligrino temporarily re-assigned Diane Digons to other working areas during the morning shift so that she would not be disturbed by Mr. Husowitz (Tr. 388). William Lamb, the employee responsible for training Mr. Husowitz for the Postage Due Technician position, also testified that Mr. Husowitz was "loud and abusive" and on one occasion the plaintiff told his co-worker that he "wish[ed Mr. Lamb] were dead" (Tr. 232–35, 245).

On March 21, 1991, based on discussions with Supervisor Pelligrino, consultations with the Labor Relations Department, and his own personal observations, Postmaster Maynes referred Mr. Husowitz to the Employee Assistance Program ("EAP") because of his "negative attitude change" (Tr. 44–45, 65, 70, 72, 188). Mr. Maynes testified that the referral was not considered disciplinary action because the plaintiff's participation in the program, excluding the initial meeting, "was purely voluntary" (Tr. 130, 132); *Defendant's Exh. F.*

Section 872.42 of the Postal Service Employee Labor Relations Manual (safety and health) Issue 12, provides that, "Postal managers and supervisors who have identified employees with apparent alcohol or drug-related employment problems are responsible for referring such employees to the [EAP] program" *Defendant's Exh. F.* Although this provision does not expressly authorize the referral of employees for matters unrelated to suspected drug or alcohol abuse, Daniel Reardon, former Supervisor of the EAP program, testified that the program regularly accepted referrals for problems other than those involving drugs and alcohol (Tr. 316). Mr. Reardon further testified that while the agency specialized in alcoholism and drug addiction, all other problems were referred to outside agencies (Tr. 322–24).[7]

---

7. In 1992, Article 35 of the National Agreement was amended to expressly authorize the counseling of employees for problems involving matters

Mr. Reardon testified that on March 22, 1991 he interviewed Mr. Husowitz at the Farmingdale Post Office (Tr. 319); *Defendant's Exh. E.* Mr. Reardon testified that the plaintiff was initially "very agitated" for having to attend the meeting but after questioning Mr. Reardon's credentials as a counselor, the plaintiff actively participated in the session (Tr. 319, 325). During the course of the interview, Mr. Husowitz revealed to Mr. Reardon that he had bi-polar affective disorder. Mr. Husowitz further communicated that he would not attend additional counseling sessions in conjunction with the EAP program because he was already under the care of Dr. Pelosi (Tr. 322–23).

Three days after the EAP meeting, Mr. Husowitz reported to work playing his radio at a very-high volume (Tr. 397). Mr. Pelligrino instructed the plaintiff to use headphones so that he would not disturb the other employees within the post office. In spite of the supervisor's instructions, Mr. Husowitz continued to play the radio "super loud" without headsets, and each time he was asked to lower the volume, Mr. Husowitz would begin to sing aloud (Tr. 397–98).

Later that morning, Mr. Husowitz accused Mr. Pelligrino, who was then the Supervisor of Mails & Delivery, of withholding his pay check. (Tr. 399–400). After receiving his check "approximately two hours" after his colleagues, Mr. Husowitz sought Mr. Pelligrino and demanded that he receive all future pay checks at the same time as the other distribution clerks (Tr. 399–400, 426). Postmaster Maynes testified that it was Mr. Robert Lorch's responsibility as Supervisor of Administration to distribute the plaintiff's pay check because at the time, Mr. Husowitz was reporting to both Supervisors Pelligrino and Lorch (Tr. 400); *Defendant's Exh. E.*

The court does not credit plaintiff's testimony that the late check resulted from deliberate misconduct on the part of Mr. Pelligrino or any other postal employee.

On March 31 and April 1, 1991, Mr. Husowitz posted and distributed two different notices throughout the Farmingdale Post Office detailing the pay check incident from the previous week and warning the Postal Service that future acts of discrimination would result in his filing of a lawsuit (Tr. 426–28); *Defendant's Exhs. II and NN.* The plaintiff's letter, dated April 1, 1991, which Mr. Husowitz also sent to Postmaster Maynes, states, "Lou [Supervisor Pelligrino], I am telling you that I want my pay check handed to me as quickly as you hand it to other clerks in distributing. I do not want excuses, I want my pay check. I will remind you again prior to the next pay period. Joe Husowitz" *Defendant's Exh. II.* This letter followed the plaintiff's general notice that had been posted near the employee's time clock two days earlier. That notice provided:

To Mr. Maynes/Staff,

Effective immediately, all acts, subtle or otherwise, of harassment, discrimination, or attempts to stigmatize me, in any way, shape, or form will not be tolerated.

However, these acts will be documented and used against you and your staff as evidence for the purpose of taking legal action against you at some future date.

In Clear + Good Conscience
s/Joseph Husowitz

*Defendant's Exh. NN.*

On April 3, Mr. Pelligrino observed the plaintiff using the telephone in the registration area, a section of the Post Office designated for authorized personnel only (Tr. 402); *Defendant's Exh. E.* After instructing Mr.

---

other than drugs and alcohol. Article 35 § 1, as amended, provides, in pertinent part:

> [T]he EAP will be expanded, as provided in Section 2 hereof, to encompass the education, identification, referral and guidance of:
>
> 2.) Those employees and their families experiencing other family and/or personal problems which could or do have a negative impact on the employee's work performance

*Defendant's Post–Trial Exh. A.*

Noting that the provision was amended after Mr. Husowitz had been referred to EAP counsel-

ing, the Government produced a document, entitled "EAP Client Profile Data Intake," that had been used by EAP counselors prior to the 1992 amendment. The document corroborates Mr. Reardon's testimony that EAP counselors had not been limited in the types of matters they heard. *Defendant's Post–Trial Exh. C.* The section of the EAP Client Profile sheet labeled "Problem Category" lists 17 different categories for which counseling may be provided; item eight is entitled "Emotional/Mental Health". *Id.*

Husowitz to use the telephone on his (Mr. Pelligrino's) desk, the plaintiff became enraged.

The confrontation continued the following morning after Mr. Pelligrino again observed the plaintiff using the telephone within the registry section (Tr. 403). Mr. Pelligrino directed the plaintiff to place the call on hold and to take it from the phone on his (Pelligrino's) desk located outside the registry section (Tr. 403). Mr. Husowitz reluctantly left the registry area and then repeatedly sang aloud "I don't want to" and "Working on a chain gang" (Tr. 404–06); *Defendant's Exh. E.*

Mr. Pelligrino testified that he received complaints from the plaintiff's co-workers demanding an explanation as to why Mr. Husowitz was receiving preferential treatment and what disciplinary action was going to be taken against their colleague (Tr. 356). Article 16, § 2 of the National Agreement between the Postal Service and its employees provides, "For minor offenses by an employee, management has a responsibility to discuss such matters with the employee" *Defendant's Exh. J.* However, in spite of his frequent acts of misconduct and insubordination, Mr. Pelligrino did not initiate disciplinary action. He testified that he was prevented by the plaintiff from discussing his concerns with the plaintiff (Tr. 392–97, 406).

Mr. Pelligrino testified that he did not attempt to transfer Mr. Husowitz to another department because the plaintiff was in a senior "bidded assignment"[8] (Tr. 391). To remove Mr. Husowitz from the business reply area, the Postal Service either had to prove that Mr. Husowitz acted negligently or that he could not do his job. According to Mr. Pelligrino, there was no question that

"[Mr. Husowitz] could do the job when he wanted to. He chose not to" (Tr. 391).

Mr. Pelligrino further testified that he decided against disciplinary action because he "really feared [the plaintiff].... I handled it the best way I knew how" (Tr. 365). He stated that each time he attempted to engage Mr. Husowitz in a discussion about his conduct, the plaintiff either walked away or began to sing (Tr. 362–63).

Following the second telephone incident within the registry area, Mr. Husowitz on April 3, 1991 threatened Mr. Pelligrino. Mr. Husowitz told his supervisor, "[D]o you remember Oklahoma?.... if I go down, you are coming with me". Messrs Pelligrino and Alleva testified that this was a reference to the 1986 shooting of fourteen Postal Service employees by a former employee (Tr. 404–05, 571).[9] The court credits the testimony that this was a threat of physical violence.

After discussing this incident with the Superintendent of the Farmingdale Post Office, Mr. Pelligrino that same day placed the plaintiff on "Emergency Non–Work Status," pursuant to Article 16, § 7 of the Postal Service's Labor Relations Manual, on the grounds that the plaintiff "may be injurious to [him]self or others" (Tr. 177–80, 406–10); *Defendant's Exh. J.* Postmaster Maynes agreed with the action and supplemented it with a letter, dated April 4, 1991, addressed to Mr. Husowitz informing the plaintiff that he would receive administrative leave pay[10] during the suspension but was prohibited from returning to work until further notice *Defendant's Exh. D.* This is the suspension that is at issue in this action.

Mr. Maynes also issued a request to Dr. Veal, a medical officer of the United States

8. Mr. Husowitz was awarded the position based on his senior status.

9. On August 21, 1986, the *New York Times* reported that on August 20, 1986 a Postal Service employee, Patrick Henry Sherrill, a 44 year-old part-time letter carrier, killed 14 co-workers and himself at the United States Post Office located in Edmond, Oklahoma. According to the police, Mr. Sherrill, was a weapons expert in the United States Marine Corps from 1964–1966, and had received an unfavorable performance evaluation prior to the killings and was reportedly fearful of

losing his job. *See* Peter Applebome, *Mail Carrier Kills 14 In Post Office, Then Himself, N.Y. Times,* Aug. 21, 1986, at A1.

Mr. Husowitz admitted to making the comment but claims that he was not referring to the Postal Service shooting but rather to a country and western duet, "You Are The Reason God Made Oklahoma" (Tr. 490).

10. Plaintiff was paid in full during the period of the suspension without any loss of seniority (Tr. 186).

Postal Service, for a psychiatric re-evaluation of Mr. Husowitz *Defendant's Exh. E.* On April 15, 1991, Dr. Paul Miller examined the plaintiff pursuant to the postmaster's request *Defendant's Exh. AA.* Following the examination, Dr. Miller issued a report in which he concluded:

> Mr. Husowitz is in the manic phase of his Bi-polar disorder, although he may really be only hypomanic at this time. His illness interferes with his ability to function at work. The patient needs to be in regular psychotherapy. His lithium dosage needs to be increased. He cannot only go to see his doctor once every 2 months.

*Id.*

The testimony elicited at the trial established that upon returning to the Farmingdale Post Office in 1990, Mr. Husowitz had continued to attend weekly counseling sessions with Dr. Pelosi (Tr. 452) and that the frequency of their therapy sessions was reduced to once every two months by April 1991.[11]

Dr. Pelosi testified that Mr. Husowitz did not pose a threat of violence even though bipolar disorder is a "mood disorder" which has been recognized to pose a threat of violence in some cases (Tr. 459–60). Dr. Pelosi further testified that he was aware that Mr. Husowitz was having work-related problems and that his conduct was "probably, [but] not necessarily, related to his bi-polar disorder ... [E]ach time Mr. Husowitz would tell me of his arguments or problems with the post office, it would always be a red flag....." (Tr. 457–58; 464). The doctor advised Mr. Husowitz to avoid engaging in heated arguments because the additional stress could result in another "episode" (Tr. 459, 466, 469).

Mr. Husowitz testified on his own behalf. The plaintiff testified that the therapy sessions and prescribed medication permitted him to satisfactorily perform all of his duties at the Farmingdale Post Office (Tr. 475–76). Mr. Husowitz stated that he was "singled out" by his colleagues and the subject of their "continuous harassment" due to his dis-

ability (Tr. 184, 479). The plaintiff further testified that the Postal Service's rules were applied more stringently against him compared to his co-workers, and that Mr. Pelligrino rejected his offers to reconcile their differences (Tr. 494). The court does not credit this testimony.

Mr. Husowitz concedes that he sometimes sang songs at work and acted in a disrespectful manner towards Mr. Pelligrino. However, according to the plaintiff, this was just his way to "diffuse the [tense] situation" (Tr. 494).

In March 1992, the plaintiff was medically cleared and reinstated to his former position, pursuant to § 324 of the Employee Manual (Tr. 201); *Defendant's Exh. I.* However, upon his return from emergency non-work status there was no improvement in his conduct (Tr. 527). On his first day back, Mr. Husowitz repeated his previous threat to Mr. Pelligrino. This time, the plaintiff told his supervisor, "Lou, do you remember Oklahoma? When I go down, I am bringing others with me" (Tr. 527–28). Mr. Pelligrino documented the incident, and a few days later Postmaster Maynes issued the plaintiff another letter of warning (Tr. 529).

In addition to the persistent singing, loud outbursts, complaints, and disruptions, it was also apparent that the quality of Mr. Husowitz' performance in the postage due area had not improved (Tr. 530). Mr. Pelligrino, whose responsibilities included tabulating the mail left over for delivery from the prior day, testified that on one occasion, Mr. Husowitz left behind "approximately four feet of mail" (Tr. 539–40). Mr. Pelligrino further testified that carry over mail is not unusual within the distribution area, however, the plaintiff was assigned to the postage due section which handles priority mail that is to be delivered daily (Tr. 540–41).

In June 1992, John Trahan replaced Postmaster Maynes as the Officer–in–Charge of the Farmingdale Post Office (Tr. 548–50).[12] Mr. Trahan testified that he assigned additional employees to work in Mr. Husowitz' area after receiving complaints from custom-

11. Dr. Pelosi testified that he continued to treat the plaintiff until February 1996 (Tr. 452–53).

12. "Officer–in–Charge" is equivalent to Postmaster except the former is an interim position.

ers claiming that they had not been receiving their postage due and business reply mail in a timely manner (Tr. 554, 556–58). Upon investigation, Mr. Trahan concluded that "Mr. Husowitz was taking in excess of six and seven hours to perform a job that people not as skilled could do in two and three [hours]" (Tr. 556).

In October 1992, Mr. Trahan suspended the plaintiff for thirty days, with pay, for insubordination and use of language in violation of the Postal Service's code of ethics (Tr. 550–52). The suspension arose from the plaintiff's refusal to remove an empty beer bottle [13] from his desk. The plaintiff had retrieved from the garbage a beer bottle that had been previously removed from plaintiff's desk by Mr. Trahan. Mr. Husowitz shouted obscenities at the Officer–in–Charge (Tr. 551). Following an unsuccessful attempt by a union shop steward to calm him, Mr. Trahan had the plaintiff removed from the building and four days later placed him on emergency suspension (Tr. 551–52).

Shortly after returning from this suspension in November 1992, Mr. Husowitz was granted a position within the Vehicle Operations Maintenance area (Tr. 534, 550). John C. Alleva, who was named Postmaster of the Farmingdale Post Office in January 1993, testified that the plaintiff received the necessary training and assistance to complete his responsibilities as a Vehicle Operations Maintenance Assistant ("VOMA") (Tr. 563). When Mr. Husowitz expressed concern that he was untrained in computer data entry, which was needed to monitor the mileage of Postal Service vehicles, a computer assistant "who had spent most of her time working the computer" was assigned to assist him (Tr. 584). Mr. Alleva further testified that he first learned of Mr. Husowitz' disability in January 1996, and that regardless of his condition, Mr. Husowitz was always "afforded the same treatment as every other clerk" (Tr. 581, 588).

In February 1993, Mr. Husowitz was issued another warning letter after shouting obscenities at Mr. Trahan, who had returned to the Farmingdale Post Office to attend a meeting with the new Farmingdale Postmaster (Tr. 564). A few months later, Mr. Husowitz was again disciplined for making threatening statements to co-workers (Tr. 565).

Finally, on October 6, 1993, Mr. Husowitz was placed on emergency placement for the second time when he instructed Mr. Alleva that he had called the police. When Mr. Husowitz refused to explain to the Postmaster why he made the call, Mr. Alleva told the plaintiff to take the rest of the day off. Mr. Husowitz irately told Postmaster Trahan, "I am going to get you, I will get you" (Tr. 568). It was at that point that Mr. Husowitz was placed on non-pay Emergency Placement. Before leaving the building, the plaintiff shouted to Supervisor Sal Modena, "You are next" (Tr. 568, 572).[14]

Mr. Husowitz filed a grievance challenging the October 1993, suspension. The grievance, which went to arbitration in November 1994, was heard before Arbitrator Carl T. Bignon. The decision of Mr. Bignon, dated January 19, 1996, includes the following:

> The Arbitrator is persuaded that the Postmaster of Farmingdale has a legitimate concern and responsibility to provide, to the extent of his capability, a safe work environment, free of threats, harassment and intimidation. It was his determination that the actions of Mr. Husowitz were such that his removal warranted. The Arbitrator finds that the credible evidence supports that determination. Based on the foregoing, the Arbitrator finds that the emergency placement in an off duty status [in October 1993] was proper; and the proposed removal and the decision to remove Mr. Husowitz were for just cause. Accordingly, the grievances are denied.

*Defendant's Exh. MM;* (Tr. 570). Shortly following the arbitrator's ruling, Mr. Husow-

---

**13.** According to Mr. Trahan's testimony, the plaintiff had wrapped an empty Budweiser beer bottle with tissue paper and inserted a light bulb in the top of the bottle. The plaintiff placed a sign on it "OIC Lamp" referring to Mr. Trahan, the Officer–in–Charge of the post office (Tr. 550).

**14.** Mr. Alleva testified that Mr. Husowitz' actual words were either, "You are next" or "You too are next" (Tr. 568).

itz was discharged from the Postal Service in February 1996 (Tr. 497).

## DISCUSSION

Initially, because the plaintiff is acting *pro se*, in reviewing the complaint and the evidence in this case, the court recognizes the mandate of the Supreme Court that a *pro se* complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers" *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), and the Second Circuit's instructions "that a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he (or she) has a valid claim" *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 762 (2d Cir.1990), *cert. denied*, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991) (quoting *Satchell v. Dilworth*, 745 F.2d 781, 785 (2d Cir.1984)).

### I. Burden of Proof Under the Rehabilitation Act

It is well-established law that a plaintiff in an employment discrimination case

> has the burden[, first] of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection [or termination]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Hargett v. National Westminster Bank*, 78 F.3d 836, 838 (2d Cir.1996) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (internal quotations and citations omitted)).

### II. Plaintiff's *Prima Facie* Case

The Rehabilitation Act was enacted to deter discrimination by employers against any individual with a disability, as defined in the

Act, solely on the basis of that disability. *See Sedor v. Frank*, 42 F.3d 741, 745 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2279, 132 L.Ed.2d 283 (1995) (citing *Gilbert v. Frank*, 949 F.2d 637, 640 (2d Cir. 1991)). The protections afforded to a handicapped individual by section 504 are as follows:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[15]

29 U.S.C. § 794(a).

■ Thus, to prevail on his employment discrimination claim, Mr. Husowitz must establish that (1) he is an individual with a disability within the meaning of the Act, (2) he is otherwise qualified for the position in question, (3) he was excluded from the position solely on the basis of his handicap, and (4) his employer received federal funding. *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir.1995) (citing *Sedor*, 42 F.3d at 746); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035 (2d Cir.), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *Doe v. New York Univ.*, 666 F.2d 761, 774–75 (2d Cir.1981). If proof of any of the four elements is insufficient, the claim fails. *Sedor*, 42 F.3d at 746.

In the instant case, there is no dispute that Mr. Husowitz is "an individual with a disability" as defined by the Act. The phrase "individual with a disability" is defined as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B); *see also* 45 C.F.R. § 84.3(j); 29 C.F.R. § 1613.702(a). The gov-

---

**15.** Subsequent to the commencement of this action, the Act was revised in 1992, so as to substitute the phrase "individual with a disability" for "handicapped person." *See* 29 U.S.C. § 794(a).

ernment has conceded that this element has been established (Tr. 598).

Similarly, there is no question that the fourth requirement is satisfied since the United States Postal Service is expressly listed as a federally funded employer within the Act. There is a dispute, however, regarding the second and third elements of the cause of action. The Postal Service argues that in April 1991, Mr. Husowitz was placed on emergency non-work status not for his disability but for specific incidents of misconduct. Second, the Postal Service asserts that even if the court finds that it suspended the plaintiff on the basis of his disability, Mr. Husowitz' claim fails because he did not demonstrate that he was "otherwise qualified" for his position.

### A. Basis for the Suspension

■ The Postal Service asserts that in April 1991, Mr. Husowitz posed a risk of danger to "[him]self or others" and that it placed the plaintiff on emergency non-work status based on his conduct rather than based on any disability.

■ To establish that his suspension was "solely by reason" of his disability, Mr. Husowitz must show (a) a causal connection between his disability and the employment decision and (b) that the disability was the only cause of that decision. *Sedor*, 42 F.3d at 746 (citing *Teahan v. Metro–North Commuter R.R. Co.*, 951 F.2d 511, 515–17 (2d Cir.1991)). "The causal relationship between disability and decision need not be direct, in that causation may be established if the disability caused conduct that, in turn, motivated the employer to [discipline] the employee...." *Id.*

■ The Second Circuit rejects the distinction between a handicapping condition and specific conduct for determining if an employer's decision to take action against an employee is based on the plaintiff's disability. *See Teahan*, 951 F.2d at 516. In *Teahan*, the Court of Appeals held:

> [T]he handicap [or disability] and its consequences are distinguished for purposes of § 504 only in assessing whether or not the firing was discriminatory. If the conse-

quences of the handicap are such that the employee is not qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing is 'solely by reason of' the handicap.

*Id.* Thus, where the employer demonstrates that its decision was influenced, at least in part, by some other factor than the plaintiff's disability, then the plaintiff's discrimination claim must be denied. *Sedor*, 42 F.3d at 746.

■ The employer may not, however, rely on the so-called "pure heart, empty head" defense, claiming that it was unaware of any connection between the plaintiff's disability and his conduct. *See Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In *Alexander*, the Supreme Court negated this defense when it recognized that discrimination against individuals with disabilities is usually not the result of animus but "thoughtlessness and indifference." *Id.* at 295, 105 S.Ct. at 717. Thus, the employer must "point to behavior that is not causally related to the [employee's] handicap." *Teahan*, 951 F.2d at 516.

For these reasons, the court finds that the Postal Service's decision to suspend Mr. Husowitz in 1991, was based on his disability. The testimony indicates that Mr. Husowitz was a valuable employee who enjoyed a distinguished career with the Postal Service of more than twenty-five years. Then in 1989, following a "depressive episode" due to bipolar disorder, the plaintiff's career took a turn for the worse from which he was unable to fully recover. Witnesses from both sides testified that Mr. Husowitz had become uncooperative, "abrupt and obnoxious," and that he made threatening remarks to his supervisors on the work area floor.

While the court does not doubt the plaintiff's sincerity when he testified that "counseling and medication" mitigated the disabling affects of his disability, it finds that Mr. Husowitz' actions between February and April 1991, were the direct result of his mental disability. Additional evidence was submitted on the status of the plaintiff's condition in the form of expert testimony from both Drs. Paul Miller and Anthony Pelosi. In view of their qualifications and involve-

ment in this matter, the court finds their testimony to be more compelling.

Dr. Pelosi, who treated the plaintiff for approximately seven years, testified that the problems Mr. Husowitz experienced at work were "probably" related to this disorder. Perhaps the most convincing evidence that Mr. Husowitz' bi-polar disorder precipitated his actions was ironically elicited from Dr. Miller, the defendant's psychiatrist. Within his report, dated April 16, 1991, the psychiatrist stated, "Mr. Husowitz is in the manic phase of his Bi-polar disorder.... His illness interferes with his ability to function at work. The patient needs to be in regular psychotherapy."

The preponderance of the evidence submitted at trial indicates that the conduct for which Mr. Husowitz was suspended was brought about by his disorder. Absent evidence to the contrary, the court finds that Mr. Husowitz sufficiently established that he was placed on emergency non-work status because of his disability. The focus thus shifts to whether Mr. Husowitz was otherwise qualified for his position with the Postal Service.

### B. "Otherwise Qualified" for the Position With or Without a Reasonable Accommodation

■ The Supreme Court has interpreted the phrase "otherwise qualified" to refer to "one who is able to meet all of the program's requirements in spite of ... handicap." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 285, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) (holding "that only those individuals who are both handicapped *and* otherwise qualified are eligible for relief"). To be qualified, the plaintiff must satisfy the requisite skill, experience, education and other job-related requirements of the position, either with or without a reasonable accommodation. *Id.* at 287 n. 17, 107 S.Ct. at 1131 n. 17; *see Gilbert v. Frank,* 949 F.2d 637, 641 (2d Cir.1991); 45 C.F.R. § 84.3(k). In making this determination, the Second Circuit recently held that the court may consider factors arising subsequent to the employer's action because the issue of "whether the employee is 'otherwise qualified' ... is for-

ward-looking...." *Teahan v. Metro–North Commuter Railroad Co.,* 80 F.3d 50, 55 (2nd Cir.1996).

■ The standard for determining whether an individual with a disability is "otherwise qualified" is well-settled. The finder of fact is required to first determine whether the plaintiff can perform the essential functions of a particular job despite his handicap, and if not, whether the employer could reasonably accommodate the employee so that he could perform the essential functions despite his handicap. *Wenner v. City of New York Dep't of Sanitation,* 1996 WL 30289, at *3 (S.D.N.Y. Jan. 24, 1996) (citing 45 C.F.R. § 84.3(k)(1); *Gilbert,* 949 F.2d at 642).

The disability acts define the term "reasonable accommodation" to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." *See* 42 U.S.C. § 12111(9)(B); *see also* 34 C.F.R. § 104.12. If such a reasonable accommodation can enable an otherwise qualified employee to perform the essential functions of a job, the employer must provide it. *See Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17; *Gilbert,* 949 F.2d at 642.

■ The plaintiff bears the burden of proving that he "is able to perform [all of] the essential functions of th[e] job, either with or without a reasonable accommodation." *Teahan,* 80 F.3d at 53–54 (citing *Borkowski,* 63 F.3d at 135 (citing *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17)). If an accommodation is required, the plaintiff only has the initial burden of coming forward with at least a "facial showing" that a reasonable accommodation exists which does not clearly exceed the value of its benefits. *Borkowski,* 63 F.3d at 139; *Misek–Falkoff,* 854 F.Supp. at 228. Once the plaintiff has done this, he has made out a *prima facie* showing that a reasonable accommodation is available. The burden of persuasion then falls on the defendant to demonstrate that the proposed accommodation is not reasonable or would

cause the employer to suffer an undue hardship. *Borkowski,* 63 F.3d at 138. The employer may satisfy its burden with "a common-sense balancing of the costs and benefits in light of the factors listed in the regulations...." *Id.* at 140.

### 1. Mr. Husowitz was not "Otherwise Qualified" Without a Reasonable Accommodation

■ The court considers a variety of factors to determine if an employee with a disability is "otherwise qualified" for his position. In *Misek–Falkoff v. International Business Machines Corp.,* 854 F.Supp. 215 (S.D.N.Y.1994), the court closely examined, among other factors, the plaintiff's interpersonal relations with her co-workers. 854 F.Supp. at 219, 226. Concluding that the employer is within its right to demand that its employees do not cause undue performance delays or contribute to a hostile work environment, the court stated that "[i]t is certainly a 'job-related requirement' that an employee, handicapped or not, be able to get along with co-workers and supervisors. Thus, conduct associated with a handicap, as distinct from the handicap itself, may be relevant to the determination of whether a person is qualified." *Id.* at 227 (citing *Teahan,* 951 F.2d at 517).

The Postal Service established that the plaintiff was uncooperative and frequently defied the orders of Supervisor Pelligrino by singing on the work floor area, loud playing of the radio, and using the telephone in a restricted area of the post office without authorization. The evidence also established that in addition to disrupting his co-workers, Mr. Husowitz was not performing, or was no longer able to perform, his Postal Service duties. Mr. Husowitz' responsibilities as a Postage Due Technician required him "to provide technical direction" and "promote harmony and cooperation." The plaintiff did not fulfill these obligations.

The plaintiff's supervisors and co-workers testified that Mr. Husowitz was unresponsive to work-related questions and Supervisor Pelligrino had to frequently remind the plaintiff of his responsibilities. Upon Mr. Husowitz' return from the suspension in 1992, Officer–in–Charge John Trahan assigned additional workers to the plaintiff's work area because of the plaintiff's inefficiency. Mr. Trahan testified that it took "Mr. Husowitz in excess of six and seven hours to perform a job that people not as skilled could do in two or three." *See Misek–Falkoff,* 854 F.Supp. at 227 (holding "[w]hat is most significant, however, is ... whether or not the job is completed in a timely manner in light of the work involved") (citation omitted).

Mr. Husowitz was a disruptive influence by his threatening behavior. He threatened his supervisor with physical violence with his remark, "[D]o you remember Oklahoma?.... if I go down, you are coming with me." [Referring to the 1986 Oklahoma shooting of fourteen Postal Service employees by a disgruntled postal employee, discussed *supra,* at n. 9 and accompanying text.] The plaintiff also engaged in threatening conduct with his co-workers. Plaintiff's overall conduct fully justifies the Postal Service's decision to suspend him. *See id.; see also Francis v. Runyon,* 928 F.Supp. 195, 205 (E.D.N.Y.1996) (holding that "[a] disabled individual cannot be 'otherwise qualified' for a position if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute"); *Thomas v. United States Postal Service,* 1990 WL 18219, at *2 (E.D.N.Y. Feb. 14, 1990) (holding that the plaintiff's "insubordination and threatening conduct towards his supervisor was sufficient to undermine his effective performance" and supported discharge); *Hunt v. New York State Division for Youth,* 1989 WL 111007, at *689137087 (N.D.N.Y. Aug. 24, 1989) (holding that the plaintiff's threatening statements to his supervisor was sufficient cause to justify his discharge).

Thus, the court finds that the Postal Service's decision of April 1991, to place the plaintiff on emergency non-work status was lawful, unless the plaintiff demonstrates that the decision was a pretext for discrimination against him on the basis of his handicap. *Misek–Falkoff,* 854 F.Supp. at 227 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The court finds no evidence that the plaintiff's suspension resulted from other than the

Postal Service's fair assessment of Mr. Husowitz' deficient performance and his gross misconduct (Tr. 177–80, 406–10); *Defendant's Exh. J.* Although various Postal Service employees were aware of the plaintiff's mental disability, there is no evidence that this was a factor in their decision-making. To the contrary, notwithstanding this conduct, the Postal Service permitted the plaintiff to return to work following a year of therapy and a psychiatric re-evaluation. Additional problems soon thereafter developed upon his return involving further threats, inadequate work performance, and his inability to get along in the workplace. This led to his suspensions in October 1992 and October 1993, and his final discharge in February 1996.

For these reasons, the court finds that plaintiff has failed to establish by a preponderance of the credible evidence that he was able to perform the essential functions of the job without a reasonable accommodation.

### 2. The Plaintiff Failed to Establish a Reasonable Accommodation

■ The Act requires an employer to make reasonable accommodations that permit disabled individuals to compete fairly with non-disabled persons. *See Fink v. New York City Dep't of Personnel,* 855 F.Supp. 68, 72 (S.D.N.Y.1994), *aff'd,* 53 F.3d 565 (2d Cir. 1995). Whether or not something constitutes a reasonable accommodation is fact-specific and is to be decided on a case-by-case basis. *See Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995).

The Second Circuit has held that " 'reasonable accommodation' does not mean elimination of any of the job's essential functions." *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 384 (2d Cir.1996) (quoting *Gilbert v. Frank,* 949 F.2d 637, 644 (2d Cir. 1991)). Neither does the Act require "the perfect elimination of all disadvantage[s] that may flow from the disability; it does not require a lowering of standards, nor that the employer 'make fundamental or substantial modifications' in order to eliminate the disadvantages flowing from the disability." *Fink v. New York City Dep't of Personnel,* 53 F.3d 565, 567 (2d Cir.1995) (internal citations omitted).

■ Mr. Husowitz has offered no proof of a reasonable accommodation on the part of the Postal Service that would have enabled him to perform his job functions. The court further finds that the Postal Service did make reasonable accommodations by permitting either Mr. Husowitz or his co-workers to work in other work areas as much as possible during the day and by affording him numerous opportunities to improve his conduct and work performance before the suspension. In spite of these efforts, the plaintiff did not perform up to the Postal Service's standards and his relationship with his co-workers continued to be marked with conflict. As many as seven different co-workers complained that they could not work in the same area as the plaintiff. Specifically, Ms. Ionnone and Ms. Renee Hertzner instructed Mr. Trahan that the plaintiff was "very abusive" towards female employees within the post office (Tr. 554). The court credits this testimony and discredits plaintiff's testimony that he was the victim of constant harassment by his co-workers.

The Postal Service established that reasonable accommodations were in fact made based on the plaintiff's bi-polar disability. In spite of these accommodations, the court finds that Mr. Husowitz was not "otherwise qualified" for the Postage Due Technician's position. Accordingly, the plaintiff's suspension did not constitute discriminatory action pursuant to the Rehabilitation Act of 1973.

### CONCLUSION

For the foregoing reasons, the court finds that the plaintiff failed to establish a violation of the Rehabilitation Act of 1973.

Judgment is granted in favor of the defendant, dismissing the complaint. The clerk is directed to enter a judgment in favor of the defendant dismissing the complaint.

SO ORDERED.