[936 NYS2d 164]

JAMES M. HAZEN, Petitioner/Respondent, v HILL BETTS & NASH, LLP, Respondent/Petitioner, et al., Respondent.

First Department, January 5, 2012

APPEARANCES OF COUNSEL

*William H. Roth*, New York City, for petitioner/respondent.

*Jackson Lewis LLP*, New York City (*Diane Windholz* of counsel), for respondent/petitioner.

## OPINION OF THE COURT

CATTERSON, J.

In this employment discrimination action arising from the termination of the petitioner attorney by the respondent law firm, we reiterate that a petitioner's disability does not shield him from the consequences of workplace misconduct.

Respondent Hill Betts & Nash (hereinafter referred to as HBN) terminated the petitioner, James Hazen, effective March 6, 2006, upon discovering that the petitioner charged hotel rooms, limousines, alcohol, adult movies and calls to escort services to his corporate American Express card and then attempted to have these charges billed to clients. On August 30, 2006, HBN reported the petitioner's misconduct to the Departmental Disciplinary Committee for the First Judicial Department (hereinafter referred to as the DDC). The petitioner filed a verified complaint with the New York State Division of Human Rights (hereinafter referred to as the DHR) on November 7, 2006 charging HBN with unlawful discrimination and retaliation. The petitioner claims that his misconduct was caused by his bipolar disorder, that HBN failed to accommodate his mental illness, that his termination was discriminatory, and that HBN retaliated against him by reporting him to the DDC.

Evidence and testimony before the administrative law judge (hereinafter referred to as ALJ) at a public hearing held during four days in December 2007 and January 2008 established the following: The petitioner was one of several partners at HBN who were issued a corporate American Express card for business expenses. HBN permitted Hazen to use the credit card for personal expenses, but required that he identify these charges and reimburse HBN. HBN's policy is to send each cardholder a sub-statement to mark up with notations indicating whether the charges are personal, chargeable to the firm or a client, or related to travel, entertainment or automobile expenses. It was not HBN's practice to return the statement to the cardholder for further review. The petitioner testified that until the period at issue in this case, he had adhered to this procedure and returned marked-up sub-statements with any receipts and payment for his personal charges.

However, in December 2005, when the petitioner was provided with a sub-statement for the last quarter of 2005, he ignored requests from HBN's accounting department and did not submit his annotated sub-statement. The petitioner stopped coming to the office in mid-December, and advised HBN that he was told to "decompress." On January 11, 2006, a partner at HBN contacted the petitioner and asked him to submit his credit card sub-statement on the following day so that the accounting department could close out the 2005 books. The petitioner sent a fax in reply stating that he could not "waste two hours coming in [to] do the bills," but that he would mark up the sub-statement and fax it to accounting. When he did not send in the sub-statement on January 12, the accounting department e-mailed the sub-statement to the petitioner again and copied two partners at HBN. That evening, one of the partners reviewed the bills, and, seeing charges for more than 50 hotel stays between September 26 and December 27, 2005, initiated an internal investigation of the petitioner's credit card use.

The day after the petitioner received the e-mail from HBN's accounting department, he asked Phillip Russotti, his friend, also an attorney, to intervene on his behalf. Russotti testified that the petitioner advised him that he was having a problem at work with his credit card reports and that the firm was demanding that he complete them. Later that day, Russotti called a partner at HBN and advised him that he had met with the petitioner and found him in a "terrible state" and that the petitioner planned to begin seeing a psychiatrist. HBN presented evidence that until this point, it was unaware that the petitioner was having any mental health issues. Russotti also requested more time for the petitioner to prepare his expense reports.

The evidence reflects that the petitioner saw a doctor on January 16. On January 17 and 25, Russotti advised HBN that the petitioner was suffering from a mental ailment, but did not specify the ailment. On January 23, the petitioner faxed the accounting department his annotated credit card sub-statement. The same day, HBN requested medical documentation supporting the petitioner's claim of mental illness and inability to return to work. However, on January 26, petitioner refused to discuss his purported illness with HBN citing "privacy" reasons.

On January 27, Russotti mailed a copy of a one-page letter from the petitioner's doctor stating that the petitioner had experienced an unspecified "severe mood disorder." None of the

correspondence contained any medical documentation of bipolar disorder or a description of the petitioner's workplace limitations as a result of his "disorder." The letter indicated only that the petitioner was responding well to treatment and was expected to be able to return to work within a few weeks.

On January 31, Russotti sent a letter to HBN on the petitioner's behalf advising HBN that the credit card substatement that the petitioner submitted on January 23 falsely listed personal expenses in December 2005 and January 2006 as chargeable to clients. Russotti explained that these false expenses were attributable to "[the petitioner's] emotional illness." On February 3, HBN's counsel informed Russotti that HBN was terminating the petitioner effective March 6, 2006.

During the hearing, the petitioner testified that although he engaged in the conduct for which he was terminated, it was caused by his bipolar disorder. The petitioner admitted that he repeatedly charged hotel rooms, limousines, and liquor to the HBN corporate card. Furthermore, during his hotel stays, petitioner charged pornographic movies and calls to escort services on the HBN card. Although HBN expected the petitioner to stay a few nights at a hotel in September to work on a case, the petitioner did not tell HBN about any of the other stays. The petitioner blamed his conduct on his bipolar disorder, and testified that he "only engaged in this inappropriate behavior and needed a companion when [he] was either in a manic or depressed state." However, he also admitted that in 2001, he had charged an escort to his corporate credit card and marked it as a client expense that was later discovered and corrected by HBN.

The petitioner testified that he also booked hotel rooms to avoid contact with people in the office on days when he was productive, but not manic. However, the petitioner explained that he booked the hotel rooms in advance on a travel Web site. The petitioner conceded that despite using the hotels for inappropriate conduct, he believed that he could list the hotel fees as client expenses because he used the rooms for work.

A partner at HBN testified that the investigation of the petitioner's expenses was concluded in March 2006 and determined that petitioner had charged $21,117.77 in personal expenses to the credit card since October 25, 2005, and attempted to list many of those expenses as billable to clients. HBN sent a letter to the petitioner on March 20 that included the investigation findings and stated the amount that the

petitioner owed to the firm. Although the petitioner testified that he could have reimbursed HBN at any time, he did not remit the balance owed. On April 24, the petitioner sent a letter to HBN indicating that he believed he was wrongfully terminated.

HBN submitted evidence that in June 2006, HBN retained a legal ethics expert to seek an opinion as to whether HBN was under a duty to report the petitioner's misconduct to the DDC. HBN's counsel advised HBN that it could not avoid reporting the petitioner's misconduct, and that the obligation to report was not affected by the petitioner's alleged disability. Following a meeting with the petitioner's counsel regarding the allegations of discrimination in July, HBN reported the petitioner's misconduct on August 30, 2006.

Nine months after the hearing concluded, on September 25, 2008, the DHR ALJ issued a recommended findings of fact, opinion and decision and order finding that HBN had discriminated and retaliated against the petitioner. The ALJ awarded the petitioner $50,000 for mental anguish, but declined to award any compensation for lost salary or benefits on the ground that the petitioner failed to show that he made reasonable efforts to mitigate damages. Both parties objected to the ALJ order and submitted supplemental briefs to the DHR Commissioner. The Commissioner issued a final order on October 27, 2010, amending the recommended order to award the petitioner compensation for lost wages through December 31, 2009, in the amount of $548,161, plus interest.

In his petition to Supreme Court, the petitioner sought to affirm the final order to the extent that it found HBN liable and calculated lost wages through December 31, 2009. However, the petitioner objected to the final order to the extent of claiming that he is entitled to additional compensation. The petitioner asserts that he should have also been awarded lost wages from December 31, 2009 through October 27, 2010, in the amount of $126,840, and an additional $200,000 for mental anguish. The petitioner also claims that he should have been awarded lost wages until his anticipated retirement date in the amount of $973,356.

The Commissioner filed a cross petition to enforce the final order as issued, and HBN filed a cross petition to annul, reverse and vacate the final order and dismiss the petitioner's complaint. By order entered March 11, 2011, Supreme Court transferred the proceeding pursuant to Executive Law § 298 and 9 NYCRR 202.57 to this Court for review.

For the reasons set forth below, we annul the Commissioner's final order, vacate the award, and dismiss the petitioner's complaint. Under the Human Rights Law, the scope of judicial review is "extremely narrow and is confined to the consideration of whether the Division's determination is supported by substantial evidence in the record." (*Matter of State Div. of Human Rights [Granelle]*, 70 NY2d 100, 106 [1987]; *see also 300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 179-181 [1978].) "Substantial evidence, which has been characterized as a minimal standard, or as comprising a low threshold, must consist of such relevant proof, within the whole record, as a reasonable mind may accept as adequate to support a conclusion or ultimate fact." (*Matter of Café La China Corp. v New York State Liq. Auth.*, 43 AD3d 280, 280 [1st Dept 2007] [internal quotation marks and citations omitted].) Although judicial review of an agency determination appears to be limited, the Court of Appeals has made clear that a reviewing court exercises a genuine judicial function and that review is more than a "rubber stamp" of an agency's determination. (*See Matter of New York City Tr. Auth. v State Div. of Human Rights*, 78 NY2d 207, 216 [1991]; *Matter of Reape v Adduci*, 151 AD2d 290, 293 [1st Dept 1989].)

In this case, the ALJ found that the respondent's reason for terminating the petitioner was a pretext and that the real reason for terminating him was his disability. We disagree. The record reflects that there is no evidence at all, much less substantial evidence, that HBN knew, before they terminated the petitioner, that the petitioner was disabled by a bipolar disorder or how that disorder limited his performance in the workplace. (*See e.g. Pimentel v Citibank, N.A.*, 29 AD3d 141 [1st Dept 2006], *lv denied* 7 NY3d 707 [2006] [employer was not required to accommodate employee's depression where employee failed to adequately explain extent and limits of her restrictions].)

The record reflects that until the petitioner began receiving requests from HBN in December 2005 to account for his credit card expenses, there was no indication that the petitioner was suffering from a mental illness. By his own account, the petitioner was able to produce "quality professional legal work" during the time he was allegedly disabled, and argued his portion of a complex summary judgment motion on December 9, 2005. Russotti testified that when he saw the petitioner in December, shortly before their January meeting, the petitioner's

behavior did not seem unusual. The petitioner's doctor's records also indicate that neither the internist who had been treating him for more than a year for diabetes, nor the therapist who had been treating him for post-9/11 stress, diagnosed the petitioner with bipolar disorder or even mentioned the possibility that he was bipolar.

Furthermore, once the petitioner began alluding to an "emotional illness," HBN specifically requested the details of the petitioner's condition in order to evaluate the medical benefits available to the petitioner, and the petitioner flatly refused to provide any information. The communications from Russotti, the petitioner, and the petitioner's doctor, contained only vague references to emotional illness or "mood disorder," and thus did not fall into the category of an "impairment . . . which . . . is demonstrable by medically accepted clinical . . . techniques." (Executive Law § 292 [21] [a].)

Thus, all that was before HBN when it terminated the petitioner on February 3 was that he had charged more than $21,000 in hotels and other personal expenses to the corporate credit card and tried to bill HBN's clients for personal expenses. Then, when confronted and asked for an explanation, he did not reimburse HBN and instead blamed his conduct on a "mood" illness, which he still did not identify.

Despite this total lack of evidence as to the petitioner's termination due to his bipolar disorder, the ALJ incomprehensibly found that HBN's legitimate reason for terminating the plaintiff was a pretext. The ALJ relied on evidence that another HBN attorney had charged $25,000 to his corporate credit card and was not terminated. However, this demonstrates only that the ALJ misapprehended the nature of the professional misconduct. The other HBN attorney did not attempt to charge clients for his personal expenses and paid the money back over time; therefore, his conduct is clearly distinguishable from the petitioner's, which essentially amounted to attempted theft from HBN and its clients.

The ALJ also noted that e-mails between two HBN partners raised an inference of discrimination. This too is not supported by record evidence. The e-mails have no direct statements of animus based on disability. Rather, they are the rational concerns of a law firm in the midst of litigating what the ALJ called "the largest case [HBN] had ever had in 10 to 15 years, with a potential for realizing damages in the hundreds of millions of dollars."

In rejecting HBN's nondiscriminatory reason, the ALJ further credited the petitioner's belated excuse that he behaved improperly because of his disability and accepted the petitioner's argument that HBN was obligated to accommodate him. The ALJ was persuaded by the petitioner's testimony and that of his doctor that the petitioner booked hotel rooms and escorts and falsified his credit card accounting as a result of his bipolar disorder.

We note that the petitioner also testified that he had engaged in the same misconduct in 2001, four years before the onset of his purported bipolar disorder, when he billed an escort to his credit card and was discovered by HBN trying to list it as a client expense. Furthermore, although the petitioner testified that he only used the hotel rooms and escorts when he was either manic or depressed, he also testified that he booked the rooms on line weeks in advance. Thus, the only way to credit the testimony that his disorder caused him to engage in such behavior, is to accept the preposterous notion that he was able to predict his mental state weeks in advance and plan accordingly.

The record further refutes the ALJ's findings. Petitioner submitted the sub-statement on January 23. By that time, he had seen his doctor twice. On January 25, the doctor reported that the petitioner had responded promptly to drug treatment on January 16 and continued to have a "brisk, robust response to appropriate treatment." This testimony directly refutes the petitioner's claim that the sub-statement was the "diary of a madman."

■ Even were we to accept that there was some evidence—sufficient to satisfy the substantial evidence standard—that the petitioner was disabled and that his misconduct was caused by his disability, HBN was not required to excuse that misconduct as an accommodation. Well-established precedent demonstrates that the New York State Human Rights Law "does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace." (*Valentine v Standard & Poor's*, 50 F Supp 2d 262, 289 [SD NY 1999], *affd* 205 F3d 1327 [2d Cir 2000]; *see e.g. McPhatter v New York City*, 378 Fed Appx 70, 72 [2d Cir, May 24, 2010] [even assuming that employee had a history of a disability, the reasons for terminating the employee, including poor attendance, disciplinary record, and other insubordinate behavior, were not pretexts for disability-based discrimination].)

There are few reported decisions examining workplace misconduct resulting from a bipolar condition. In each case, the court found that the employer was not required to endure misconduct simply because the employee is disabled. (*Husowitz v Runyon,* 942 F Supp 822 [ED NY 1996]; *Davila v Qwest Corp., Inc.,* 113 Fed Appx 849 [10th Cir 2004].) Nor is the employer required to retroactively excuse the misconduct as an accommodation under the Americans with Disabilities Act of 1990 (ADA) (42 USC § 12101 *et seq.*). (*Davila,* 113 Fed Appx at 854.) In *Davila,* the petitioner was terminated for workplace violence and argued that his termination was based on his bipolar disorder, which the employer should have accommodated. In dismissing the petitioner's claim, the court found that "excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability [was] offered as an after-the-fact excuse is not a required accommodation under the ADA." (*Id.*)

In this case, the record is clear that it was not until after the petitioner accrued the expenses on his corporate credit card, and was asked to account for them, that he then consulted an attorney and sought a diagnosis from a psychiatrist. Thus, here, as in *Davila,* the petitioner has offered his disability as an "after-the-fact excuse."

The Equal Employment Opportunity Commission (EEOC) similarly acknowledges that an employee's disability does not relieve him of the consequences of his misconduct. EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, ¶ 30 (EEOC Notice No. 915.002 [Mar. 25, 1997]) specifically provides that "an employer [may] discipline an individual with a disability for violating a workplace conduct standard if the misconduct resulted from a disability," when "the workplace conduct standard is job-related for the position in question and is consistent with business necessity." Here, it is undisputed that charging personal expenses to clients constitutes serious job-related misconduct.

The ALJ's finding of retaliation is also not supported by substantial evidence. We note at the outset that DR 1-103 of the Code of Professional Responsibility (22 NYCRR 1200.4), which was in effect in August 2006, requires an attorney to report another attorney's violation of the rules. (*See* Rules of Professional Conduct [22 NYCRR 1200.0] rule 8.3.) The ALJ concluded that the proximity of notification by the petitioner's attorney of his discrimination claim in July to HBN's report to the DDC in August 2006 raised an inference of retaliation. It is undisputed

that in June HBN consulted an attorney specializing in ethics and was advised that it had an *obligation to report* the petitioner's attempted theft to the DDC if it had a reasonable belief of wrongdoing, regardless of the petitioner's disability. Thus, HBN has provided a legitimate, nondiscriminatory reason demonstrating that the report was not retaliatory.

Accordingly, the determination of respondent State Division of Human Rights, dated October 27, 2010, which, in this employment discrimination proceeding (transferred to this Court, pursuant to Executive Law § 298 and 22 NYCRR 202.57 [c] [2], by order of the Supreme Court, New York County [Lucy Billings, J.], entered March 11, 2011), after a hearing, found that respondent Hill Betts & Nash, LLP unlawfully discriminated against petitioner James Hazen, and awarded petitioner damages, is annulled, on the law, without costs, the award vacated and the complaint dismissed.

MAZZARELLI, J.P., DEGRASSE, ABDUS-SALAAM and ROMÁN, JJ., concur.

Determination of respondent State Division on Human Rights, dated October 27, 2010 (transferred to this Court, pursuant to Executive Law § 298 and 22 NYCRR 202.57 [c] [2], by order of the Supreme Court, New York County, entered March 11, 2011), annulled, on the law, without costs, the award vacated, and the complaint dismissed.